Mystik Tape, Div. of Borden, Inc., Petitioner, *v.* The Pollution Control Board *et al.*, Respondents.

(No. 58660;

First District (5th Division)—December 28, 1973.

*Rehearing denied January 25, 1974.*

James W. Kissel and Thomas M. McMahon, both of Chicago (Sidley & Austin, of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (Douglas T. Moring, Richard W. Cosby, and Harvey M. Sheldon, Assistant Attorneys General, of counsel), for respondents.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

On this appeal, Mystik Tape, a division of Borden, Inc., (Mystik), seeks review of an order of the Pollution Control Board (Board) which "assessed" a "penalty" of $3500 against Mystik and required it to submit to the Board within 45 days a program which "shall result in the complete abatement" no later than June 1, 1973, of odor pollution caused by its facility. Mystik was also directed to post security of $100,000 to insure compliance with the abatement order. The pollution found by the Board to have been caused by Mystik was stated to be in violation of sections 9(a) and 9(b) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1009) and Rule 3—2.110 of the Air Pollution Control Regulations. This is a direct review of the Board's action as provided by the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 110, par. 264 et seq.), and by Supreme Court Rule 335 (Ill. Rev. Stat. 1971, ch. 110A, par. 335).

The Illinois Environmental Protection Agency (EPA) filed a complaint with the Board under section 31 of the Act alleging odor violations by Mystik. Hearings were held before a Hearing Officer, as provided in sections 31 and 32 of the Act. Witnesses testified for both EPA and Mystik, and a transcript was made of all the testimony. The record of the hearings was presented to the Board for consideration on December 15, 1972, and the Board's order was entered on January 16, 1973.

There are six issues raised in the appeal of this case. The first two deal with the adequacy of the complaint. These issues concern whether a violation of the Act itself, absent the existence of any pertinent regulations, is a permissible basis for Board action, and whether the complaint gives Mystik adequate information as to the alleged violation. The third issue concerns the propriety of the Board's order with respect to some of its references to the record. The fourth issue, also bearing on the validity of the Board's order, relates to the introduction of irrelevant or immaterial evidence. The fifth issue is whether Mystik can be held in violation of the Act in view of the fact that the Board has failed to determine standards applicable to this type of case, as mandatorily required by section 5(b) of the Act. The sixth issue is whether the Board's order was proper under the terms of the Act and was supported by adequate evidence. We shall consider these points in order.

1. *Complaint alleging a violation of the Act*

The language of section 31 indicates three possible kinds of violation which may be made the basis for the filing of a complaint by EPA:

"\* \* \* [T]he Agency shall issue \* \* \* a formal complaint, which shall specify the provision of *this law* or the *rule* or *regulation* under which such person is said to be in violation, \* \* \*. (Emphasis added.)

Other sections of the Act also indicate that alternate kinds of violation are possible. For example, section 30 states that

"The Agency shall cause investigations to be made upon the request of the Board or upon receipt of information concerning an alleged violation of *this Act* or of any *rule* or *regulation* promulgated thereunder \* \* \*." (Emphasis added.)

Section 9, the provision allegedly violated in this case, states that no person shall:

"(a) Cause or threaten or allow the discharge or emission of any contaminant into the environment \* \* \* so as to cause \* \* \* air pollution in Illinois \* \* \* *or* so as to violate regulations or standards adopted by the Board under this Act \* \* \*." (Emphasis added.)

■■ On review, it has also been recognized that alternate kinds of violation are possible. (*City of Monmouth v. Environmental Protection Agency* (1973), 10 Ill.App.3d 823, 295 N.E.2d 136.)

The complaint in the instant case alleges:

"Respondent did and does operate said plant \* \* \* in such a manner as to cause, threaten or allow the discharge, emission, and presence of such duration of such quantities and characteristics of odors \* \* \* and other air contaminants \* \* \* into and in the outdoor atmosphere and environment \* \* \* as to be injurious to human, plant, or animal life, to health, or to property, or to interfere unreasonably with the enjoyment of life or property, and so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, in violation of Section 9(a) of the Act."

Since the complaint specifically alleges violation of the Act itself, it has, in our opinion, satisfied one of the three alternative requirements of section 31 noted above. Indeed, the language of the complaint borrows heavily from sections 3(b) and (d) and section 9(a) of the Act. These sections, taken together, prohibit the discharge of contaminants (including odors) into the atmosphere in sufficient quantities and of such characteristics and duration as to be injurious to human, plant or animal life, to health, or to property, or to interfere unreasonably with the enjoyment of life or property.

## 2. Notice and information as to the charge in the complaint

Section 31 also requires that the complaint state both "the manner in, and the extent to which [the person complained against] is said to violate this law." Notice to such person is, of course, a fundamental element of procedural due process, and the Illinois courts have frequently recognized its necessity. In a recent case under the Administrative Review Act, the court said:

"It is true that charges in an administrative proceeding need not be drawn with the same nice refinements and subleties [sic] as pleadings in a court of record, but the charges must be sufficiently clear and specific to allow the preparation of a defense [citation]." *Greco v. State Police Merit Board* (1969), 105 Ill.App.2d 186, 190, 245 N.E.2d 99.

In *Citizens Utilities Co. v. Pollution Control Board*, 9 Ill.App.3d 158, 289 N.E.2d 642 (1972), the court noted in dicta that section 31 requires "notice of a specific violation charged," "notice of the specific conduct constituting the violation," and "the benefit of a favorable burden of proof." 9 Ill.App.3d 164, 289 N.E.2d at 647.

It appears from the language of previous orders that the Board itself requires that complaints conform to the notice requirement of section 31. In *EPA v. Commonwealth Edison*, Board No. 70-4 (February 17, 1971), the Board said that a count charging air pollution (as defined in the Act) without mentioning the particular contaminant involved was a "bare conclusion" insufficient to inform the respondent of the nature of the charges against it. In *Commonwealth Edison*, the complainant attempted to introduce evidence of a particular contaminant, sulphur dioxide, to prove up the count charging section 9(a) air pollution. The Board refused to consider this evidence, saying:

"It is important here to distinguish the degree of specificity required in a statute from that required in a complaint. In the case of a statute a good deal of latitude is allowed the legislature, since that body could not possibly foresee the myriad fact situations that might give rise to excessive pollution * * *. The case is quite different, however, with regard to a complaint. There is no excuse for lack of specificity in filing a complaint except the desire to obtain an unfair advantage by surprise. To permit such an advantage is foreign to the entire concept that a tribunal is to make every effort to ascertain the true facts, and it deprives a respondent of his day in court." 70—4 at pp. 3-4.

The Board also cited Pollution Control Board Procedural Rule 304(c)(2), which requires that the complaint contain "a concise statement of the facts upon which the respondents are claimed to be in violation."

However, in a later Board order, *EPA v. Granite City Steel Co.*, Board No. 70—34 (March 17, 1971), it was noted that in *Commonwealth Edison*, the Board had upheld the sufficiency of those allegations referring to violations of precise numerical standards. The Board said that *Commonwealth Edison* did not require that a complaint plead evidence, and said that since the complaint in *Granite City* alleged the particular equipment from which emissions were said to have occurred and specified the dates of such alleged violations, it met the requirements of section 31. The Board also noted that Granite City had availed itself extensively of the discovery procedures provided by Board rules. Thus, if any evidence at the hearing had nevertheless surprised the steel company, it would have been free to argue for its exclusion on that ground at the hearing. A later Board order, *EPA v. City of Champaign*, Board No. 71—51C (September 16, 1971), reiterated the Board's belief that the discovery procedures provided by the Board's Procedural Rules can cure notice defects of a complaint. In that case, the Board rejected the city's contention that the complaint was insufficient for failure to specify the pollutants involved and failure to allege the facts complained of with sufficient particularity, saying that even if the city's contentions were true,

"* * * the points raised by these arguments could have all been covered, and actually were covered, * * * by the ample discovery procedures afforded to all parties by the Hearing Officer pursuant to the Rules of the Pollution Control Board." 71-51C at p. 2.

The complaint in this case states that Mystik's plant contains

"* * * vessels wherein natural bale rubber * * * is mixed with natural resins in a hexane-type bath and vented to the atmosphere, twelve (12) tanks wherein said coating solution was and is stored and vented to the atmosphere, and nine (9) polymerization ovens wherein the selected coating solution was and is continuously applied to the backing sheets * * *."

The complaint also states that Mystik used this equipment in such a manner as to "cause, threaten or allow the discharge, emission and presence" of volatile, perfume-like and other odors and odor-producing gases, aliphatic hydrocarbons, liquids, vapors and particulate matter.

It appears to us that this language in the complaint satisfies the statutory requirement that Mystik be informed of the "manner" of the alleged pollution. Here, unlike *Commonwealth Edison*, the complaint states the source of the odor and its nature. In addition, as noted above, section 31 requires that the complaint state the "extent" of the alleged violation. This complaint states that Mystik violated the Act to such an extent as to

"* * * be injurious to human, plant, or animal life, to health, or to property, or to interfere unreasonably with the enjoyment of life or property and so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, in violation of Section 9(a) of the Act."

This allegation of the extent of the violation is sufficient in light of the fact that the complaint does not allege the violation of a specific regulation. The complaint alleges a violation of the Act itself, and the language of the Act states (Section 3 (b)) that a violation occurs only when some form of air pollution is injurious to human, plant or animal life, to health, or to property or unreasonably interferes with the enjoyment of life or property. In the latter clause, which as we shall see is the one pertinent to this case, the key word is "unreasonably." The Act itself, in section 33(c), in effect defines the term "unreasonably" by directing the Board as to what factors it *shall* take into consideration in determining that essential element of a violation. Section 33(c), in pertinent part, states:

"In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source."

■■ In summary, the complaint in this case alleges a violation of a particular statutory provision. It specifies the equipment and the nature of the contaminants which are involved in the alleged pollution. The record indicates that there was adequate time for making use of the broad discovery provided by Pollution Control Board Procedural Rule 313. The complaint also indicates the extent of the alleged violation; using the language of the Act, the complaint indicates that the alleged violation was either injurious or an unreasonable interference with the enjoyment of life or property. It is our conclusion that when the various sections of the Act referred to are taken together, the meaning of the complaint's allegations are sufficiently clear and specific.

3. *The propriety of some of the Board's references to the record*

There is another problem concerning the complaint with which we must deal. The original complaint in this case was filed on April 27, 1972; it alleged a violation of the Act on each day from July 1, 1970, to the date of filing. An amended complaint, filed June 8, 1972, also alleged violation to the date of filing. A second amended complaint alleging violation of section 9(a) "continuing until the close of the record" was rejected by the Board. During the hearings, however, the Hearing Officer received evidence of numerous events subsequent to June 8, 1972, and the Board granted Mystik's motions, made many times during the hearings, to exclude all such evidence from its consideration. Nevertheless, in its order the Board made findings of fact, each with reference to "principal supporting items of evidence," as required by the Board's own Procedural Rule 331. These record references form an extremely critical part of the Board's order as they purport to contain the evidentiary factual basis for its conclusion as to violations by Mystik, yet much of the testimony cited concerned dates after June 8, 1972 (and two items prior to July 1, 1970), thus falling outside the time scope of the complaint and the Board's own decision in regard thereto. Thus, in our view, they inescapably weaken the Board's conclusion. Examples of such references in the Board's order are to record pages 127, 248 (249), 298-300, 340-344, 388, 389-92, 393, 432, 461-462, 493, 648, 652, and 655.

■■ One of the most important findings concerning the existence of an odor violation of the Act is set forth in the introductory sentence to the part of the Board's order which makes its findings of fact. It states:

> "There is testimony that citizens were affected by *noxious* odors emitted from the plant *prior to 1970* (R. 127-130)." (Emphasis added.)

Nowhere in the pages cited from the record is there any mention of the word "noxious"; indeed, the testimony on pages 127-130 of the record does not relate to any effect of the alleged odors on citizens. In addition, as we have mentioned, this finding is improper in light of the fact that the period covered by the complaint commenced July 1, 1970. Nor does the testimony on pages 127-130 of the record appear in either the abstract filed in this court by Mystik or in the additional abstract filed by the EPA (probably indicating that the EPA became cognizant of the impropriety of this otherwise important finding).

The Board's findings continue as follows:

> "Other witnesses provided records indicating that there were numerous days between January, 1970 and June 8, 1972 when they were aware of *noxious* odors at the Mystik plant (R. 101-11, 211-39, 290-321, 321-369, 369-410, 410-488a, 448b-477, 622-690)." (Emphasis added.)

Again, the Board cited a time span commencing prior to that covered by the complaint. In addition, the Board again described the odors as "noxious." This important term, which could scarcely have been employed inadvertently, is not to be found in *any* of the testimony cited by the Board in the numerous "specific page references to principal supporting items of evidence" with which it is required to supplement its findings under its own rule. The use by the Board of the term "noxious" is inapposite not only because the word was not used by any witness, but also because its meaning, according to Webster's Third New International Dictionary, is "harmful or destructive to man or to other organisms." We therefore construe a finding as to the emission of "noxious odors" as falling under that part of the Act which refers to pollution injurious to health or to human, plant or animal life. But, obviously, because of lack of evidence as to these matters, the allegation of this particular kind of violation was ignored in the briefing and specifically abandoned by counsel on oral argument. This case in its present status therefore refers only to the charge of unreasonable interference with the enjoyment of life or property.

The Board's order continues its findings and principal supporting evidence, stating that "All witnesses identified the Mystik plant as the source of these odors and were positive of the source." However, the most specific testimony cited as to source came from Gordon Bess, a 17-year-old student witness for the EPA, who testified that "The source of the emission was a cylindrical blower on Mystik's roof." We consider this statement to have been thoroughly impeached by William Barton, the environmental engineer for all of Borden's chemical plants, who testified that "The cylindrical blower identified by Gordon Bess is an air conditioner condenser for the office building."

Other findings by the Board, as referred to above, involved a recitation of the particular phrases by which witnesses for the EPA had characterized the odor. Of the eight characterizations cited, four were questionable for various reasons. The first quote by the Board of such testimony described the odor as "rubber or burning rubber (R. 248)." This reference is to the testimony of an EPA witness which, again, it was not seen fit to include in the additional abstract. We assume that this omission may have been because there was a "tepee" type incinerator—much criticized as a source of pollution—(located only a few hundred yards from Mystik's plant), which frequently did burn rubber and plastic products, and identification of the source of this odor by the witness was therefore weakened. Or it may have been omitted because the date testified to was outside the time scope of the complaint. In the former hypothesis, we consider it to have minimal probative value as a "principal supporting

item of evidence," and in the latter case we may not consider it at all. ■■ The second characterization quoted by the Board was "heavy or acrid like a new plastic object or magic marker (R. 299)." This was as of a date outside the complaint period. The next quote by the Board was from a witness who described the odor as "sharp, acrid, smelling like burning adhesive (R. 457)." The Board did not quote his further testimony which included that "it was a typical odor of burning adhesives, an odor I have smelled before." Nor did the Board quote his cross-examination, during which he said that he had seen big rolls of tape but conceded that he had never been present any place where he had actually smelled adhesives of any kind being burned. The last of these four characterizations, "sweet (R. 394)," was also testified to as of a date outside the time period of the complaint. Even so, we cannot conceive of the possibility that emission of a "sweet" odor would constitute a sufficiently unreasonable interference with the enjoyment of life or property to justify the closing of a plant such as Mystik. In addition to these problems with some of the eight characterizations, four of them are not to be found in either abstract ("heavy or acrid like a new plastic object or magic marker," "rubber or burning rubber," and "strong, penetrating and pungent"). While these phrases were relied on by the Board as principal supporting evidence, in accordance with Rule 331 quoted above, it must have become apparent later that this evidence was so unimportant, weak, or unreliable that it was omitted from the additional abstract.

■■ As a reviewing court, it is our duty to examine the procedural methods and manner in which evidence was elicited before an administrative agency. (*Golden Egg Club, Inc. v. Liquor Control Com.* (1970), 124 Ill.App.2d 241, 260 N.E.2d 329.) And in this case, the Board's proper and express decision to exclude from its consideration evidence of events prior to July 1, 1970, and after June 8, 1972, is contradicted by its citation of such events as "principal supporting items of evidence" for its findings. Therefore, the Board has to a very considerable extent violated the oft-stated requirement that the findings of an administrative agency be based on competent and sufficient evidence. (*Murphy v. A. H. Luecht & Co., Inc.* (1942), 379 Ill. 227, 40 N.E.2d 69.) However, since the Board's findings were also based on some additional evidence of events which occurred within the time period covered by the complaint, we conclude that its references to improper testimony do not constitute a sufficient basis, in themselves, for us to set aside its order, though the testimony thus referred to will, of course, be ignored by this court.

   4. *Introduction of irrelevant and immaterial evidence*

Mystik also contends that it was deprived of due process because irrelevant and immaterial evidence (apart from evidence of events which occurred outside the time scope of the complaint), was admitted at the hearing, in Mystik's terminology, "for what it might be worth." In its brief Mystik argues that

> "* * * there is much in this record which would never be acceptable nor worthy of any real consideration if subjected to the normal scrutiny and objections accorded proffered testimony in any court hearing."

We shall consider this point first in relation to the Administrative Review Act and then in relation to the Environmental Protection Act.

■■ The EPA does not deny that some evidence was improperly admitted during the hearings. Although a hearing officer is required by section 5(a) of the Act and by the Board's Procedural Rule 204 to be a lawyer licensed to practice in Illinois, it is quite clear that he may and probably will make mistakes in his rulings on evidence. But the real question here is not whether the Hearing Officer adhered to the rules of evidence in civil cases. The same strict rules which apply in judicial proceedings with reference to the admissibility of evidence do not apply in proceedings before an administrative agency. (*Mitchell v. Sackett* (1960), 27 Ill.App.2d 335, 169 N.E.2d 833; *Rauland Division, Zenith Radio Corp. v. Metropolitan Sanitary Dist. of Greater Chicago* (1971), 2 Ill.App.3d 35, 275 N.E.2d 756.) A failure to observe the technical rules of evidence is not sufficient reason to set aside an agency's decision unless the error or failure materially affects the rights of any party and results in substantial injustice to him. (Administrative Review Act, Ill. Rev. Stat. 1971, ch. 110, par. 275(2); *Lo Piccolo v. Department of Registration & Education* (1972), 5 Ill.App.3d 1077, 284 N.E.2d 420.) Mystik has cited no specific examples of any evidentiary rulings by the hearing officer which materially affected its rights or resulted in substantial injustice, and our perusal of the record has revealed no such rulings. In short, the technical errors in the proceedings before the hearing officer did not transgress proper procedures under the Administrative Review Act.

The more specific question under this point of the case is whether the hearing officer adhered to the Procedural Rules of the Board itself, and, if not, whether his failure to do so materially affected Mystik's rights or resulted in substantial injustice to Mystik. Procedural Rule 320 requires that:

> "(a) The Hearing Officer shall receive evidence which is admissible under the law of the rules of evidence in Illinois pertaining to civil actions. In addition, the Hearing Officer may receive

material, relevant evidence which would be relied upon by a reasonably prudent person in the conduct of serious affairs which is reasonably reliable and reasonably necessary to resolution of the issue for which it is offered; provided that the rules relating to privileged communications and privileged topics shall be observed.

(b) The Hearing Officer shall exclude immaterial, irrelevant, and repetitious evidence.

(c) When the admissibility of disputed evidence depends upon an arguable interpretation of substantive law, the Hearing Officer shall admit such evidence."

Even assuming that the hearing officer in this case did receive some evidence inadmissible under Procedural Rule 320(b), we believe that the language of Rule 320(a) and (c) mitigate 320(b) to a significant extent. Were it otherwise, the hearing officer might feel compelled to follow the rules of evidence required in ordinary civil suits. Mystik has given us no indication that any of the Hearing Officer's erroneous rulings on evidence materially affected its rights or resulted in substantial injustice to the company. Mystik has cited no examples from the record of rulings on evidence which violated Rule 320. Under these circumstances, we find that the rulings of the Hearing Officer did not deprive Mystik of due process.

5. *The standards required to be determined by the Board pursuant to section 5(b)*

Mystik argues that it has been deprived of due process because the standards required by section 5(b) were not previously articulated by the Board. Section 5(b) provides:

"The Board *shall* determine, define and implement the environmental control standards applicable in the State of Illinois and *may* adopt rules and regulations in accordance with Title VII of this Act." (Emphasis added.)

The EPA claims that the standards required by section 5(b) have already been provided by the legislature in the form of the statutory language which Mystik allegedly violated. The EPA would have us combine sections 9(a), 3(b) and 3(d), the bases for the alleged statutory violation, to arrive at the standards required by section 5(b).

■■■ It is true, as the EPA argues, that the legislature has provided some standards in the Act itself. It is also correct that the language of the sections noted above is as clear as that used in the statutory framework of other states' pollution statutes. (*Air Pollution Com. v. Coated Materials Co.* (Pa. Ct. Comm. Pl. 1970), 1 ERC 1444; *Houston Compressed Steel Corp. v. Texas* (Tex. Civ. App. 1970), 456 S.W.2d 768; *Department of Health v. Owens-Corning Fiberglas Corp.* (1968), 100

N.J. Super. 366, 242 A.2d 21, *aff'd* (1969) 53 N.J. 248, 250 A.2d 750.) In theory, standards set by a legislature may be sufficient to guide an administrative agency. However, there is a difference between standards set up by the legislature to guide an administrative agency and standards formulated by an administrative agency itself. While the chief issue in administrative law until recently was whether legislatures provided adequate standards to guide administrators, the focus now is not on legislative standards, but rather on administrative standards, formulated by the agency under a grant of power from the legislature. An authority on administrative law has stated that

> "The notion that the courts must compel the legislative body to state an intelligible principle to guide all exercise of delegated power wrongly assumes that the only wisdom to be found in the various organs of government is entirely concentrated in the legislative body. * * * The legislative body, of course, should have power within constitutional limits to determine overall governmental policies, but it should also have power to entrust subordinate agencies to make rules and to adjudicate cases, with or without legislative direction, as the legislative body may choose."
> *Davis, Administrative Law Treatise*, § 2.05 at 98-99 (1958 ed.)

However, section 5(b) clearly states that the *Board shall* determine, define, and implement environmental control standards. The Board itself has recognized in previous orders that this language mandates that, as far as feasible, it "declare the standards and rules that guide its determinations." (*Granite City Steel*, Board No. 70-34.) Indeed, in the *Granite City* case, the Board quotes from Davis, *Administrative Law Treatise*, § 2.11 at 70 (1970 Supp.):

> "The court is on sound ground in holding that an unguided discretionary determination in a particular case is undesirable. But the best cure for that is not a nullification of the entire statute; it is a judicially-enforced requirement that the [Board] must as far as feasible declare the standards and rules that guide its determinations in individual cases * * * Such a decision * * * would have accomplished the purpose of the non-delegation doctrine."

It is clear from the discussion above that the standards inherent in the legislation itself do not fulfill the requirement of section 5(b).

■■ The next question requires a determination of what is meant by the word "standards" as it is used in section 5(b). It clearly appears that in the context of section 5(b), standards and regulations are not identical. The use of the words "shall" and "may" in the same sentence to refer respectively to standards and regulations indicates that the Board is

required to set standards but may choose whether or not to adopt rules or regulations. Although neither term is defined in the Act, the differentiation between the necessity of one and permission to make the other is consistent with the meaning usually attributed to them in administrative law. Davis has explained that

. "When legislative bodies delegate discretionary power without meaningful standards, administrators should develop standards at the earliest feasible time, and then, as circumstances permit, should further confine their own discretion through principles and rules. The movement from vague standards to define standards to broad principles to rules may be accomplished by policy statements in any form, by adjudicatory opinions, or by exercise of the rule-making power." Davis, *Administrative Law Treatise,* § 4.15 at 213 (1970 Supplement).

While there can be no question but that, through the Act, the legislature delegated discretionary power to the Board, it limited this power with the requirement of section 5(b) that the Board "determine, define and implement" standards.

The legislature also set forth in the Act two means of developing standards. The Board's enforcement hearings and its adoption of substantive regulations both lend themselves to the development of the standards required by section 5(b). The delineation of standards may be achieved through sections 31 and 32, which provide for enforcement hearings. Section 31 describes a mandatory procedure; if an investigation discloses the possibility of a violation of the Act or a regulation promulgated under it, the EPA must issue a formal complaint against the alleged violator. Hearings must be held before a qualified hearing officer (Board members may, but need not, be present), and parties are allowed many of the options of civil litigation: they may present their own witnesses, cross-examine those of the opposition, and make oral or written argument. The hearing focuses on the limited fact situation before the Board; section 33 requires the Board to consider "the written and oral statements, the testimony and arguments that shall be submitted at the hearing." The Board must issue and enter a determination which, under section 33, must state the facts and reasons leading to its decision. As noted above, the Board's Procedural Rule 331 requires that the Board's decisions include "findings * * * and conclusions, as well as the reasons or basis therefor."

Thus, in writing its opinions and orders, the Board may not simply discuss the evidence and announce a result. Section 33 and Rule 331 require, in effect, that each Board opinion have value as a precedent in subsequent cases involving similar violations. This statutory scheme

seems to us to endorse the proposition that the Board be permitted to determine the standards in question through a system parallel to the common-law method of case-by-case decisions.

Sections 30-33 provide a mandatory scheme for enforcement; the EPA must file a complaint if certain conditions are met, and the Board must hold hearings and reach a decision. In contrast to this Board activity is what we believe to be the option of developing standards through regulations. In essence, section 5(b) provides that while standards must be determined, they may, but need not, be developed through the use of regulations. Sections 27 and 28 describe the procedure for making regulations. These two sections suggest that regulations may provide refinements (for instance, numerical) which are difficult to achieve through enforcement hearings, which concern a limited fact situation. Regulations are promulgated only after thorough non-adversary hearings in which the Board acts as a fact-finding body. At least one member of the Board must be present at the hearings.

■■ Section 10 provides for the adoption of regulations relating to air pollution. This section says that the Board may adopt regulations which may, among other things, prescribe

"(a) Ambient air quality standards ＊ ＊ ＊

(b) Emission standards ＊ ＊ ＊

(c) Standards for the issuance of permits ＊ ＊ ＊

(d) Standards ＊ ＊ ＊ regarding the sale, offer or use of any ＊ ＊ ＊ article determined by the Board to constitute an air-pollution hazard;

(e) Alert and abatement standards ＊ ＊ ＊

＊ ＊ ＊

(g) ＊ ＊ ＊ standards for equipment and procedures for monitoring contaminant discharges at their sources ＊ ＊ ＊."

Mystik has argued that the Board should have adopted odor regulations pursuant to section 10 of the Act, saying that absent a statement of precisely what types and quantities of odors are violations of the Act, the company is powerless to prevent the possibility of prosecutions and unable to conform its operations to numerical limits. However, the provisions for the formulation of regulations are optional; the word "may" consistently is used with reference to regulations in sections 5(b), 10, and 27. Section 27 also provides that regulations may deal with limited problems:

"Any such regulations may make different provisions as required by circumstances for different contaminant sources and for different geographical areas; may apply to sources outside this State ＊ ＊ ＊ and may make special provision for alert and abatement

standards and procedures respecting occurrences or emergencies of pollution or on other short-term conditions constituting an acute danger to health or to the environment."

We are aware that recent cases have said that courts should require administrative agencies to formulate clear and specific standards. (*Environmental Defense Fund, Inc. v. Ruckelshaus* (D.C. Cir. 1971), 439 F.2d 584, 598.) We also recognize that it may be feasible to adopt specific regulations in some circumstances. This Board has, in fact, considered proposed air pollution regulations, including regulations for odor, and has adopted odor regulations in some factual situations not pertinent to this case. (See Illinois Air Pollution Regulation Proceeding R71-23, Newsletter #35, November 10, 1971.)

Mystik now argues that "there is absolutely no valid reason why the Board could not have adopted objective odor standards applicable to * * * [Mystik]." Mystik notes that *Illinois Pollution Control Board Rules and Regulations, Chapter 2, Part VIII, Odors* contains regulations pertaining to inedible rendering processes, and says that since "the Board has adopted objective odor standards applicable to another category of manufacturing activity," such objective standards are technologically feasible for Mystik.

However, in its trial brief before the Board, Mystik indicated that

"On the subject of 'odor pollution' generally, the record is clear that the field is in a primitive and formative stage of development. The inability to identify, quantify or guarantee control has produced at least the following results: 1) regulatory agencies have been unable to adopt odor standards; 2) industry has been forced to adopt a trial and error approach to control; and 3) there is frequently disagreement (as in this case) as to what is the cause or the source of alleged odorous emissions.

The failure to adopt odor standards cannot be blamed on the Illinois regulatory agencies. The evidence to support such regulations obviously simply does not exist." (Petitioner's trial brief at 17.)

Although the Board has not adopted, and, in our opinion, is not required to adopt regulations at this time to deal with odor pollution, prosecution for a violation of the Act itself is still possible, as we noted above. Thus, this action has taken the form of a hearing to enforce section 9(a) of the Act. The questions that remain are whether the Board has, in its opinion and order, articulated standards applicable to this case, as required by section 5(b); and, if so, whether the standards conform to the mandate of the Act itself.

The opinion of the Board states, in part:

"There is testimony that citizens were affected by noxious odors emitted from the plant prior to 1970 (R. 127-130). Other witnesses provided records indicating that there were numerous days between January, 1970 and June 8, 1972 when they were aware of noxious odors being emitted from the Mystik plant * * *. All witnesses identified the Mystik plant as the source of these odors and were positive of the source. They based their certainty on wind direction, visual observation and inspection of surrounding area."

The Board noted both the witnesses' characterizations of the odor, and their reactions to it. The Board also said:

"The odor did not appear to cause any property damage or to force people to seek medical treatment. However, there is no question that the odors interfered with the comfort and enjoyment of life of the nearby residents, and constituted a nuisance and violated Section 9(a) of the act prohibiting the causing of air pollution * * *. While Respondent has conscientiously pursued various methods of alleviating the problem there is no question that the emissions have created a burden on the community and have resulted in air pollution."

■■ Overlooking the fact that a substantial part of the evidence referred to is outside the time scope of the complaint, from these excerpts, certain standards would emerge if the Board's order were to be approved. In the future, in determining whether an odor violation of section 9(a) exists, it would appear that the Board will be prepared to consider whether citizens were aware of odors and, if so, whether these odors were "noxious," whether and in what manner complainant can isolate the odor, the severity with which the odor affects the witnesses, whether anyone seeks medical treatment, and whether there is any property damage. The Board will find an odor violation of section 9(a) if the odor "interferes with the comfort and enjoyment of life of the nearby residents," and "constitutes a nuisance," and "creates a burden on the community."

We think that the standards which the Board discussed in this opinion and order do not conform to the legislatively-imposed mandate of the Act itself. Section 3(b) of the Act defines air pollution as the presence of sufficient quantities and qualities of contaminants as to (1) be injurious to human life, (2) be injurious to plant life, (3) be injurious to animal life, (4) be injurious to health, (5) *unreasonably* interfere with the enjoyment of life, or (6) *unreasonably* interfere with the enjoyment of property. Although, as we have indicated above, there was a finding that the odors were "noxious," there was no testimony to support that finding, nor a finding of injury to life or health in any form. Therefore,

the Board's finding of a violation of the Act must rest on a finding that the alleged pollution *unreasonably* interfered with the enjoyment of life or property, and set forth standards which would be clearly recognizable as not only possible but also reasonable of compliance.

■■■ The opinion states that the emissions "violated Section 9(a) of the act prohibiting the causing of air pollution." However, this statement is simply a conclusory phrase which contributes nothing to the achievement of those standards required by the legislature in the form of the statutory language. Such a statement does not provide the necessary recognition of the elements which are required by the statute to make a finding of "air pollution" as defined by sections 9(a), 3(b), and 3(d). Furthermore, there is a growing agreement among courts that administrative agencies should be required to articulate their findings clearly instead of stating that a statute has been violated:

> "Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible. * * * Discretionary decisions should more often be supported with findings of fact and reasoned opinions." *Environmental Defense Fund, Inc. v. Ruckelshaus* (D.C. Cir. 1971), 439 F.2d 584, 598.

See also Davis, *Discretionary Justice* (1969) at 58, 59; *Mil-ka-ko Research & Development Corp. v. Office of Economic Opportunity* (D.C. Dist. 1972), 352 F.Supp. 169, 173; *Citizens Ass'n of Georgetown, Inc. v. Zoning Com'n of D.C.* (D.C. Cir. 1973), 477 F.2d 402, 409; *Permian Basin Area Rate Cases* (1968), 390 U.S. 747, 20 L.Ed.2d 312, 88 S.Ct. 1344, 1373; *Appalachian Power Co. v. Environmental Protection Agency* (4th Cir. 1973), 477 F.2d 495, 505.

■■■ While we believe that the Board may comply with the statutory requirement to establish standards through a decisional process, we believe it did not properly do so in this case and a further caveat would appear to be in order on this point. Assuming the Board were to have set forth with precision the standards to be met by Mystik, such standards would, of course, still have to be reasonable, as one man's stench can be another man's fragrance. But, in addition, a person found to have been an offender against the standards set by the order would have to be given a reasonable time within which to comply, *before* the assessment of any kind of penalty, or we would then agree with Mystik's contention as to failure of due process. We do not decide the question of the authority of the Board to assess a money penalty, as that question is now pending before the Supreme Court. But as to all sanctions which are within the Board's authority, the Board cannot be permitted to enter the kind of compliance order it did in this case, and at the same time leave the per-

son found to have been guilty of air pollution in the dark as to how he may comply. Witness the fact that in this case Mystik presented what it considered would be a rather extensive and expensive program of compliance which was rejected by the Board out of hand.

■■ The Board's order also found that Mystik had violated section 9(b) of the Act by its installation and operation of equipment and odor counteractant devices without obtaining a permit from EPA. Section 9(b) provides

"No person shall:

\* \* \*

(b) Construct, install, or operate any equipment, facility, vehicle, vessel, or aircraft capable of causing or contributing to air pollution or designed to prevent air pollution, *of any type designated by Board regulations,* without a permit granted by the Agency, or in violation of any conditions imposed by such permit; \* \* \*." (Emphasis added.)

In view of our basic conclusions in this case, we consider that this part of the Board's order falls for lack of any foundation as to determination of standards. We further believe that a careful reading of section 9(b), quoted above, discloses that it applies only to the construction, installation or operation of equipment *of any type designated by Board regulations.* Since there have been no regulations promulgated by the Board covering the type of equipment involved here, this part of the Board's order must fall for that reason also.

*6. The propriety of the Board's order under the terms of the Act and the sufficiency of the evidence*

In this case the Board's order, in its conclusions, found that the odors emitted from Mystik's plant "interfered with the \* \* \* enjoyment of life of the nearby residents." Nowhere in the opinion or order is there an explicit finding that this interference was "unreasonable," as required by the statutory language. The opinion and the order do both mention that the odors from the Mystik plant constituted a "nuisance." This leads to the question of whether a finding of "nuisance" fulfills the statutory requirement of a finding of "unreasonable interference with the enjoyment of life or property."

We believe that from the syntax of the Board's opinion and order, it is difficult to tell what the meaning of the word "nuisance" is supposed to be. It seems to be at most a descriptive term; furthermore, in the order, it is used in the conjunctive with the words "air pollution":

"2. \* \* \* Mystik \* \* \* shall submit to the Board \* \* \* a program for the abatement of air pollution and nuisance caused by its facility as demonstrated by the record in this proceeding."

Thus, it would appear that a finding of nuisance is not meant to have been the same as a finding of air pollution. In previous opinions, the Board has not used the word "nuisance" consistently to refer to any one thing; indeed, the Board has used "nuisance" in several contexts:

(1) In *League of Women Voters of Illinois v. North Shore Sanitary District*, 70—7 (October 8, 1970), the Board said that there was no question that one of the sewage plants involved was a "*nuisance* to its neighbors." (Emphasis added.)

(2) In *Texaco v. EPA*, 70—29 (February 17, 1971), the Board's opinion said: "the record contains only Texaco's assessment of the extent of the nuisance * * *. The evidence * * * is not sufficient to permit a determination whether Texaco is in violation of [section 9(a)]", and a concurring opinion said "No one has a right to impose *unreasonable nuisance* or hardship on his neighbor simply because it is more profitable to him." (Emphasis added.)

(3) In *EPA v. Incinerator, Inc.*, 71—69 (September 30, 1971), the Board said "The continued operation of the Incinerator plant with its frequent, almost daily, shower of particulate matter and the accompanying odors, constitutes nothing short of a *nuisance to the neighborhood* * * * *The sole question to be determined, then, is whether such interference is 'unreasonable' as required in the definition of air pollution in the Act.*" (Emphasis added.)

(4) *Lloyd A. Fry Roofing Company v. EPA*, 71—4 (October 14, 1971): "It is abundantly clear that Fry's operation * * * have [sic] caused a severe burden and *nuisance* upon the community. If Fry had pursued the program of emission control * * * it would now undoubtedly be in compliance with the regulations and the *nuisance* impact would be substantially lessened." (Emphasis added.)

From the language quoted above, it is evident to us that the Board's use of the word "nuisance" is neither consistent nor instructive as a finding concerning violation of the specific language of the statute. As distinguished from the *League of Women Voters* opinion, quoted above, the use of the word "nuisance" in the *Texaco* and *Incinerator, Inc.* opinions seems to indicate that a finding of nuisance does not indicate the essential finding of unreasonable interference within the meaning of the Act.

Surprisingly, the vital part of the appellees' brief is drafted in support of the authority of the Board to meet its statutory obligations by the finding of a common law nuisance. It cites a number of Illinois cases to show that there can be such a thing as a common law nuisance created by the emission of odors. There can be, we trust, no room for argument

on this point, but its applicability to the case before us is a very different matter.

■■ The Board cites as "the leading case," *Metropolitan Sanitary District of Greater Chicago v. United States Steel Corp.*, 41 Ill.2d 440, 243 N.E.2d 249. That was a suit to restrain pollution as a nuisance under Ill. Rev. Stat. 1967, ch. 42, par. 326aa. The defense was that the term "pollution" as used in the statute was void for vagueness, there having been no legislative attempt to define the term. The court held that, under that circumstance, the statute closely resembled the long-established equity suit to restrain pollution as a nuisance. We perceive a clear distinction between that case and that statute, and the case and statute with which we are now dealing, because the Act before us does supply a complete statutory definition of air pollution which supersedes and must control the elements of the situations with which it deals.

It is argued that the order in the present case indicating that Mystik's emission "violated Section 9(a) of the act" and "created a burden on the community," constituted an adequate compliance with the Act by the Board, but we think that neither of these phrases amounts to a sufficiently specific finding that Mystik did *"unreasonably* interfere with the enjoyment of life" as required by the Act.

■■ It should be noted that in section 33(c), the meaning of, as well as the bases for, a finding of unreasonableness are quite clearly set forth. In addition, a recent opinion by this court held that the Board must consider the factors listed in section 33(c) if it is to comply with this section. (*Incinerator, Inc. v. Pollution Control Board* (1974), 15 Ill.App.3d 514.) We believe that the only way the Board's consideration of these factors could satisfactorily be manifested in the instant case would be in its opinion and order, and, as we read the order in the present case, it fails to disclose a full consideration of "all the facts and circumstances bearing upon the reasonableness of the emissions." It is the duty of this court to require the Board to act strictly within the boundaries of its jurisdictional grant as created by law, and thus to guard the rights of the parties which are guaranteed by the Act as well as by the Constitution. (*Hankenson v. Board of Education of Waukegan Township* (1956), 10 Ill.App.2d 79, 134 N.E.2d 356.) "Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the [legislative] policy underlying a statute." *N.L.R.B. v. Brown* (1965), 380 U.S. 278, 291, 13 L.Ed.2d 839, 85 S.Ct. 980.

We are especially reluctant in this case to ignore the apparent lack of any consideration of what constitutes *unreasonable* interference in light of the manner in which this word has been used by the Board in

some of its opinions. In *Moody v. Flintkote*, 70—36, 71—67 (September 2, 1971), the Board passed over some of the aspects of the four factors required by section 33(c) when it found that the emissions from the Flintkote plant interfered with the enjoyment of life and property, and said:

> "It is the position of this Board that air contaminant emissions are 'unreasonable' within the meaning of the Act when there is proof that there is an interference with life and property and that economically reasonable technology is available to control the contaminant emissions."

The *Moody* test was repeated in several later Board opinions involving section 9(a): *Employees of Holmes Bros., Inc. v. Merlan, Inc.* 71—39 (September 16, 1971); *EPA v. Incinerator, Inc.*, 71—69 (September 30, 1971); *EPA v. Chicago Housing Authority*, 71—320 (April 4, 1972); *EPA v. American Generator and Armature Co.*, 71—329 (January 6, 1972).

■■ The significance and importance of section 33(c), quoted above, has, we think, been underestimated not only by the Board, but also by the court in *Ford v. Environmental Protection Agency* (1973), 9 Ill.App. 3d 711, 292 N.E.2d 540. There, the plaintiff contended that the Board's order failed to demonstrate its compliance with section 33(c) because there was no indication in the order that it had taken into account the factors enumerated therein. The court said:

> "Section 33(c) has reference to mitigating factors, and where pertinent and applicable to a particular case, it was the intent of the legislature that such of the factors as were known to the Board through its expertise or put into issue by evidence before it, should be considered by the Board in making its determination." 9 Ill. App.3d at 720.

We believe this interpretation to be contrary to the language of the Act itself, which clearly states that in making its orders and determinations the Board *shall* take into consideration *all* the facts and circumstances, including but not limited to the four factors listed. In addition, section 31(c) provides that

> "In hearings before the Board * * * the burden shall be on the Agency or other complainant to show * * * that the respondent has caused * * * air * * * pollution or that the respondent has violated * * * any provision of this Act * * *. If such proof has been made, the burden shall be on the respondent to show that compliance with the Board's *regulations* would impose an arbitrary or unreasonable hardship" (Emphasis added.)

Even if the Appellate Court in the *Ford* case were correct in its assumption that the factors of section 33(c) need be considered only if known to the Board through its expertise or put into issue by evidence introduced at the hearing, it is clear that in the case before us Mystik did put into issue the Board's compliance with all subsections of section 33(c), and in this court strongly urges that the EPA failed to meet its burden of proof with respect thereto. Concerning "the social and economic value of the pollution source," (subsection ii), Mystik introduced evidence through the testimony of its Administrative Director of the number of basic tapes made by Mystik, its special-order products manufactured to particular specifications to meet the requirements of other industries, Mystik's average number of employees (546, including 30% members of minority groups), the average monthly payroll ($581,000), the extent of the total land area in Northfield owned by Mystik (20.2 acres), and the amount paid to local governmental units in property and utility taxes ($136,000 in 1971).

Concerning "the suitability  *  *  *  of the pollution source to the area in which it is located, including the question of priority of location in the area involved," (subsection iii), Mystik introduced evidence that its original Northfield facilities were built in 1953, long before the high school was built or its site selected. Village of Northfield zoning maps as of December 9, 1953, and as of March 23, 1965, were also introduced and showed that the property on which the plant is located has been zoned for "light industrial" use during the entire period, and testimony established that there had been no change through the time of the hearings. Mystik introduced the Central Business Area Report for Northfield in which a study was made of which of the problems in the village needed most improvement. A questionnaire, including numerous items, was sent to all Northfield residents for use in this report. In response to the question, "Which of these items in the Village need the most improvement?" *none* of the residents checked the category "air pollution." This fact is consistent with the type of local witnesses presented by the EPA. Four were 16- or 17-year-old high school students, two of whom were members of an environmental committee which had sought to obtain a large number of signatures to forms complaining of odor from Mystik's plant (apparently unsuccessfully as they were not offered to the hearing officer). None of these students was impeded from continuing whatever activity he or she was engaged in at the time covered by the testimony concerning odors noticed. This included not only athletic activities but even the eating of lunch outdoors. The athletic field is used for track, cross-country, soccer, football, baseball, lacrosse, field hockey, golf competition and practice and physical education classes,

yet not a single coach, administrator, faculty member or parent was presented as a witness in this case. (The one teacher who testified [see the second paragraph below] did so as a resident, not as a representative of the high school.)

One of the references made by the Board in its order was to the testimony of a witness who was captain of the high school cross-country team, and who testified about "feeling nauseated." Actually, the witness' testimony was that sometimes the odor gave him a "mild case of nausea," but he testified further that his twenty-member team and 60 to 70 members of the track team practiced by running one to two hours daily during the spring, and that he had never taken any medication for the effects of the odor about which he testified. We consider it noteworthy that he also testified he had smelled odors from car exhaust emanating from Edens Expressway which is a very heavily travelled highway immediately adjoining the atheletic field to the east.

The worst one of these students could say about the odor she had smelled was that it "caused me to wrinkle my nose." A woman high school teacher who testified that she got a headache every time she smelled the odor had taught at the high school since September 1969, and started "noticing" the odor at that time and thereafter. Nevertheless, she moved into a townhouse directly across the street from Mystik's plant in Sepember 1971. A housewife neighbor (whose attorney husband filed the original complaint) moved into the same location in September 1970 under a one-year lease which they renewed in 1971 with no testimonial indication of wanting to move. Both of these witnesses live closer to the "tepee" incinerator than to Mystik, thus raising at least some doubt as to the source of their complaints. Another housewife testified that she had passed the plant "maybe fifty times" in the previous year while walking or riding her bike, and had "noticed" an odor "at most" six to twelve times and she "thought" it came from Mystik. Still another Northfield housewife "noticed the odor" on September 8, 1971, and on other occasions while driving by the plant to take her domestic worker to the railroad station and on trips to Winnetka, Northfield and Edens Plaza. An administrative assistant employed by the Village of Northfield had numerous occasions to visit the Mystik plant over a six-month period during which he noticed "a kind of sweet odor" about twenty times.

Other evidence was introduced as to the character of the land surrounding the Mystik plant which is located on the southwest corner of the intersection of Happ Road and Winnetka Avenue. To the east are the playing fields of New Trier West High School and just beyond them the Edens Expressway; to the south is a parking lot for the high school; to

the west is a Cook County Forest Preserve; and to the north the property is zoned and used for a combination of "industrial," "light manufacturing," "multiple dwelling," and "single family dwelling" purposes.

Concerning the "technical practicability and economic reasonableness of reducing or eliminating the emissions," (subsection iv), the record includes extensive evidence of Mystik's expensive continuing efforts to control emissions, and evidence concerning existing odor measurement techniques and methodology. Among the techniques previously tested by Mystik are a stack spray device called the Air-Chem system, a Chem-Screen system, and an attempt to incorporate odor counteractants into the formulations of the adhesives, called the Rhodia chemical system. Mystik also introduced an emission inventory which it had commissioned from an independent firm, Air Resources, Inc. William B. Barton, Environmental Engineering Manager for Borden, Inc., who holds college degrees in both chemistry and chemical engineering, testified as to the available technology for the control of odor problems, and estimated that the installation of pollution control equipment for all of Mystik's vents to the atmosphere, based on the current technology, would require a capital expenditure of $3,000,000 to $5,000,000, exclusive of operating costs. He also suggested that such equipment would have side effects.

It was the responsibility of the Board, in this case, to consider the evidence offered on all four factors of section 33(c) before arriving at its decision. As Mystik pointed out in its brief, the evidence offered by the EPA concerning the first of the four characteristics of section 33(c) (subsection i) was deficient in several respects. It is true that several people testified concerning the nature of the odor. Bearing in mind that the only part of the statute sought to be enforced is that relating to unreasonable interference with the enjoyment of life or property, the testimony of the local witnesses indicated that although each had noticed an odor at various times, the odor was simply "not pleasant" or "not very nice to breathe," or "caused [the witness'] nose to wrinkle." They did not testify that it interfered with or prevented their doing whatever it was they were doing at the time they noticed an odor. The EPA introduced the testimony of Environmental protection engineers. Their testimony, however, was also inconclusive. While the testimony of one EPA witness concerned his driving by the Mystik plant on a date after the time period established by the Board, he merely said that he "noticed a solvent odor" which "reminded" him of adhesives and of Elmer's Glue. In response, Borden's Environmental Engineer Barton (referred to above), testified that Elmer's Glue is polyvinyl acetate and unlike any product produced at Mystik's plant. This engineer also said he had never

had any specialized training in odor detection and that he did not use any odor detection instruments when he went to the Mystik plant.* The second engineer discussed the feasibility of installing an after-burner incinerator at the Mystik plant. In essence, this witness said that this equipment would reduce odor emissions so that the average person near the plant could not detect any odors. (See above as to the paucity of evidence concerning odors and the cost of the equipment recommended by EPA's engineer.) The third engineer said that he inspected the Mystik plant, and that, in addition, while he was driving by the plant, he "noticed a perfume-like smell, like a cheap perfume." Surely, such unscientific and unimportant evidence as this would not be adequate to support the Board's drastic order, as there is no evidence in this record that the Board is endeavoring to eliminate the use, sale or manufacture of cheap perfume generally.

The Board apparently has misconstrued section 33(c) and this misinterpretation has led to a serious inadequacy of evidence, and absence of standards within the Board's opinion and order. Although in making decisions and determinations, an administrative agency has authority to construe statutory provisions (*Sugden v. Department of Public Welfare* (1960), 20 Ill.2d 119, 169 N.E.2d 248), an erroneous construction of a statute by an administrative agency is not binding upon the courts. (*C. O. Baptista Films v. Cummins* (1956), 9 Ill.2d 259, 137 N.E.2d 393.) In addition, requirements with respect to administrative findings are more exacting than those relating to findings of trial courts. (*Maywood Park Trotting Ass'n v. Illinois Harness Racing Com.* (1959), 15 Ill.2d 559, 155 N.E.2d 626.) An agency must take into consideration all the elements of the subject matter before it and must not have failed to give proper consideration to any material elements, particularly those specifically required by its statutory source of authority.

Having regard to all the testimony in this record, we note that the Board not only did not, but we find that it could not, properly have found that Mystik was guilty of *unreasonably* interfering with the enjoyment of life or property. We also conclude that this defect in the Board's order would be impossible to cure by amendment as to unreasonableness because to do so would result in a finding contrary to the manifest weight of the evidence.

The order of the Pollution Control Board is set aside.

Order set aside.

LORENZ and SULLIVAN, JJ., concur.

* *Cf. Illinois Pollution Control Board Rules and Regulations, Chapter 2, Part VIII, Odors*, Rule 802, which requires quantitative odor measurement for situations involving an inedible rendering process.