(No. 26319.—

FRANCIS B. MURPHY, (Successor to Martin P. Durkin,) Director of Labor, Defendant in Error, *vs.* A. H. LUECHT & Co., INC., *et al.* Plaintiffs in Error.

*Opinion filed January 20, 1942—Rehearing denied March 12, 1942.*

Smith, J., dissenting.

Harvey L. Cavender, for plaintiffs in error.

George F. Barrett, Attorney General, (Albert E. Hallett, Jr., of counsel,) for defendant in error.

Mr. Justice Shaw delivered the opinion of the court:

This case comes to this court by direct appeal because it is claimed that the constitutionality of paragraph 5 of subsection (e) of section 2 of the Illinois Unemployment Compensation act is involved. That paragraph of the act defines an employer as: "Any employing unit which, together with one or more other employing units, is owned or controlled, directly or indirectly, by legally enforceable means or otherwise, by the same interests, or which owns or controls one or more other employing units directly or indirectly, by legally enforceable means or otherwise, and which, if treated as a single unit with such other employing units or interests or both, would be an employer under paragraph (1) of this subsection." Ill. Rev. Stat. 1941, chap. 48, par. 218.

The facts out of which this controversy arises concern the relationship of two brothers with each other, a corporation organized by them in January of 1931, a corporation subsequently acquired by them in 1937, and the relationship between these two corporations. Neither of the corporations employed as many as eight men within the provisions of the Unemployment Compensation act, but

together they employed more than eight. The Department
of Labor after a statutory hearing found that the two com-
panies were one employing unit, assessed taxes and penal-
ties against them in accordance with that finding, and this
ruling of the department was affirmed in the circuit court
of Cook county, to which court this writ of error has issued.

Prior to the year 1931 Robert Wilson and his brother
William Wilson were partners engaged in the cartage busi-
ness in the city of Chicago. In that year the business was
incorporated under the name of R. Wilson Cartage Com-
pany. In 1937 the cartage business of A. H. Luecht & Co.
was for sale and was bought by the Wilson brothers. The
brothers testified, and there is nothing to contradict their
testimony, that Robert Wilson was to retain, own and
manage the Wilson company, and that William Wilson was
to own and manage the Luecht company. This deal appears
to have been consummated on or about October 1, 1937,
and at or about that time they exchanged their shares of
stock so that Robert became the sole owner of the Wilson
company, and William became sole owner of the Luecht
company. According to the testimony of the two brothers,
these transactions were all completed on or about October 7,
1937, and that all of the legal details were left to their
attorney. Thereafter the brothers continued to occupy the
same office and to assist each other in their office work but
with separate telephones and so far as the records show
with entirely separate businesses. The Wilson company
carried on a general carting business while the Luecht
company had carts and trucks especially adapted to the
handling of flour and other merchandise in sacks to which
business it exclusively confined itself. The two companies
(or brothers) did business at the same bank, and each au-
thorized the other to represent him in any banking trans-
action while absent. The record is void of any evidence
that either brother ever gave, or had any authority to give,
any instructions or orders to the agents or employees of

the other's company. There is no evidence that the two companies or the two brothers ever had any joint or common bank account or funds, or that either ever had any salary or dividend from the company owned by the other. There is a total failure of proof of any joint or common control of the two separate businesses. The most that can be said on the face of this record is that they were brothers, occupied a common office, and accommodated each other at the bank in case of borrowing, and in the office by answering telephone calls.

The record shows that the corporate records of the two companies were very carelessly kept, that little or no attention was paid to the nice formalities of technical stock transfers, entries of such transfers, notice and minutes of directors' and stockholders' meetings, and it is largely from such technical defects that the examiner for the department draws many inferences unfavorable to the plaintiffs in error. This representative, although acting in a quasi-judicial capacity, at all times conducted the hearing in the role of prosecutor, and his summation of the testimony with conclusions and findings of fact drawn therefrom, show no evidence of any judicial approach to the problem he was supposed judicially to consider. Thus he says, "The evidence presented by the petitioners is inconsistent and conflicting in many respects. The testimony of both Robert and William Wilson is so replete with alleged failures of recollection, half truths, inconsistencies, and evasions that their testimony upon important particulars involved in this proceeding is unworthy of credence. The testimony of Kaiser is evasive and marked with alleged failures of recollection on important particulars. Furthermore, his testimony cannot be given great weight since he is a member of the firm of Cavender and Kaiser, the attorneys representing the petitioner in this matter." At another place in his report he excoriated the testimony of Robert Wilson; said it was "very inconsistent and vague." This witness

obviously was intentionally confused by the trial examiner's cross-examination as to the dates of actual transfer, *i.e.,* actual delivery of stock certificates, and the indefinite and uncertain date when the attorney got around to making entries in his own office. Likewise and for the same reason he excoriated the testimony of William Wilson. It was apparent that neither of the brothers was capable of, or ever intended to, make any fine legal distinction between the actual transactions wherein the real transfers took place, or the technical transactions of corporate book entries which were made by the attorney in his own office and at his own convenience. The prosecutor-examiner recognized only the technical transactions with which the brothers had personally nothing to do, and drew the most unfavorable inferences possible from the way the books were kept, applying these inferences not only to the technicalities involved, but to the veracity of the Wilson brothers themselves. On the other hand he accepted as gospel, and permitted to be introduced in evidence, a report of an investigator for the department by the name of Cohen which included much of hearsay and a great deal of matter that was definitely incompetent as to things said and done between others which would not be competent under any known rules of evidence.

At the conclusion of the hearing which was held as above described, the investigator made sixteen findings of fact and a recommendation which was adopted by the director of the department and confirmed by the circuit court. The first seven of his findings are of no importance in this opinion. Finding No. 8 was that Robert Wilson owned 150 shares of stock in the Luecht company from October, 1, 1937, until at least July 29, 1938; that William Wilson was the owner of 150 shares of stock in the Luecht company from and to the same dates. Finding No. 10 was that William Wilson owned 50 shares of stock of the Wilson company from January 9, 1931, until at least July 29,

1938; and No. 11 was that Robert Wilson owned 49 shares of stock in the Wilson company between the same dates. Finding No. 12 was that Mary Wilson, wife of Robert Wilson, owned one share in the Wilson company between the same dates, which was admittedly a qualifying share and of no importance. Finding No. 13 was that on July 29, 1938, certificate No. 4 in the Luecht company, for 150 shares, was still owned by Robert Wilson and had not been cancelled on the books of the company. Finding No. 14 was that stock certificate No. 3 in the Wilson company for 50 shares was still owned by William Wilson and had not been cancelled on the books of the company. Finding No. 16 was that the Wilson company and the Luecht company were controlled by Robert Wilson and William Wilson from October 1, 1937, until at least July 29, 1938. Finding No. 18 was to the effect that if both corporations were treated as a single employing unit, they employed more than eight persons; No. 19 found the wages paid by the Wilson company in detail by quarter-yearly periods; No. 20 made like findings as to the Luecht company. The examiner recommended that the assessments against both corporations for all quarters of the years 1938 and 1939 be affirmed.

No one of these findings of fact is supported by any direct evidence in the record at all, but are mere inferences drawn from the negligently kept corporate records in the office of the attorney for both of the corporations and each of the brothers. Because the corporate records were not kept up to date the examiner has assumed that William Wilson and Robert Wilson each lied about the date when they really made their deal between themselves. The fact is, as shown by their unimpeached testimony, that they actually made their deal with each other and divided the two businesses between themselves on or about October 1, 1937. The director, in that part of his argument whereby he seeks to impose the tax, invokes the familiar rule that courts

will look back of the face of a transaction to see what it really was, but at the same time ignores that same rule and seeks to impose strict technicalities as to the transfers of stock, the keeping of corporate records, etc., when he wishes to impeach the otherwise unimpeached testimony of the Wilson brothers.

The department insists, and the circuit court held that the courts were without power to review anything but questions of law presented by the record. Reliance is placed upon section 14 of the act as originally passed which contained the sentence, "review by the Circuit and Supreme Courts in the manner hereinafter provided shall extend only to questions of law presented by the record." Their position in this court entirely overlooks an amendment to the act which became effective July 1, 1941, which was between the time of the circuit court's judgment and the filing of defendant in error's brief in this court. That amendment added the words "and fact" to the sentence in question so that it now reads "review by the Circuit and Supreme Courts in the manner hereinafter provided shall extend to questions of law and fact presented by the record."

We think this amendment to the statute could have been made only for the purpose of removing a very clear constitutional objection. Under our constitution all judicial power is vested in the courts mentioned in section 1 of article 6 and provision is made in article 3 against any department exercising any power properly belonging to either of the others. It is an age-old province of courts to determine what the facts are and apply the law to them, and facts can not be determined by legislative fiat nor the power of the courts in this field of jurisprudence be limited or circumscribed by legislative action. (*Carolene Products Co.* v. *McLaughlin*, 365 Ill. 62.) We have adopted rules of decision under which we will not ordinarily disturb findings of fact which are made by a board or commission, if those findings are supported by substantial evidence. These

rules, however, are of our own creation under our constitutional powers. We conceive the amendment of the act in question to have been adopted in recognition of these well known principles.

It must furthermore be noted that this amendment, being as to procedure only, is applicable to the present case even though adopted after judgment in the circuit court and before judgment here. *People ex rel. Eitel* v. *Lindheimer*, 371 Ill. 367; *Peoples Store of Roseland* v. *McKibbin, ante*, p. 148.

Objection and argument has also been presented concerning the admission in evidence of a large amount of incompetent and immaterial matter. To this point it is urged that the ordinary rules of evidence do not apply and are not binding upon an administrative tribunal. This is ordinarily true, so far as the admission of immaterial and incompetent evidence is concerned, as in the case of a trial before a court without a jury. It does not follow, however, and it is not true that findings or inferences can be based upon such incompetent material. No matter what may be admitted in evidence, the findings and inferences must be sustained by competent and sufficient evidence. *Morgan* v. *United States*, 298 U. S. 468, 56 Sup. Ct. Rep. 906; *Novicki* v. *Department of Finance*, 373 Ill. 342.

The judgment of the circuit court, which confirmed the decision of the Department of Labor and quashed the writ of *certiorari*, will be reversed and the cause remanded to the circuit court with directions to sustain the writ and set aside the decision and award of the department.

*Reversed and remanded.*

Mr. JUSTICE SMITH, dissenting:

I do not agree with either the conclusions reached in the majority opinion or the reasoning therein contained. Even though the examiner may have admitted some evidence which was technically incompetent there is ample and substantial evidence in the record to support his find-

ings. His conclusions as to the uncertainty and unfairness of the testimony of some of the witnesses were amply justified.

In my opinion, the record shows a plain subterfuge, conceived for the sole purpose of an evasion of the law and a planned effort to escape the payment of the tax. Without the provisions contained in paragraph 5(e) of section 2 of the Unemployment Compensation act to prevent such evasions, the whole act would be rendered inoperative and subject to like fraudulent evasions by those unwilling to assume their just share of the burdens of government.

The substantial and undisputed evidence in the record justifies the conclusion that the two Wilsons owned the two corporations, which together employed more than eight employees. Regardless of the two separate corporate entities the business in which each was engaged was similar, if not identical. To say that one was engaged in trucking one commodity and the other a different commodity, is simply evading the question—they were both engaged in the trucking business. This business was operated from one office and under one management by the two Wilsons indiscriminately. The businesses cannot be classified separately simply because they may have had one fleet of truck drivers assigned to the delivery of flour and another to the delivery of other commodities. No one would expect those engaged in hauling both coal and flour to use either the same trucks or the same drivers, indiscriminately, for hauling both. To say that the provisions of this wholesome law can be defeated by such a crude subterfuge is to confess a weakness of law and government, which I am unwilling to admit.

The partisan attitude of the examiner is, in some respects, subject to criticism. He should not, however, in my opinion, be condemned simply because he did not possess that judicial bearing which prevented him from expressing what anyone reading the record must believe.