BOARD OF EDUCATION OF THE CITY OF CHICAGO, Plaintiff-Appellee, v. CARL VAN KAST, Defendant-Appellant (Illinois State Board of Education *et al.*, Defendants).

First District (1st Division)  No. 1—90—1706

Opinion filed August 30, 1993.

Ancel, Glink, Diamond & Cope, P.C., of Chicago (Ronald S. Cope, David Lincoln Ader, and John F. Donahue, of counsel), for appellant.

Iris E. Sholder, Robert J. Krajcir, and Respicio F. Vazquez, all of Board of Education of the City of Chicago, of Chicago, for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant, Carl Van Kast, was discharged from his position as a Chicago public school principal for conduct found to be irremediable by plaintiff, the Board of Education of the City of Chicago (the Board). After an administrative hearing, Gerard A. Fowler (Fowler), the hearing officer appointed by the Illinois State Board of Education (ISBE), found Van Kast's conduct remediable and reversed his discharge. The Board sought administrative review in the circuit court of Cook County, naming the ISBE and Fowler as additional defendants. The circuit court reversed the hearing officer's decision. On appeal, Van Kast contends that the trial court erred in reversing the hearing officer's decision as against the manifest weight of the evidence and contrary to law. For the following reasons, we reverse the judgment of the circuit court.

The record sets forth the following relevant facts. On February 19, 1986, the general superintendent of schools instituted proceedings with the Board against Van Kast charging him with 30 specifications of conduct unbecoming a principal in the Chicago public schools. The Board adopted the superintendent's charges and specifications and Fowler was appointed as a hearing officer by the ISBE.

A hearing on the sufficiency of the Board's charges proceeded before Fowler on 34 separate days beginning February 16, 1987, and concluding on August 12, 1987. The charges were based on Van Kast's conduct as principal between 1982 and 1985. Thirty witnesses testified at the hearing, including Van Kast, who testified on his own behalf. The testimony transcribed from the hearing along with the related exhibits of the parties encompass 24 volumes in the record on appeal.

BACKGROUND

The administrative hearing, including the hearing officer's findings, reveals the following relevant facts. Van Kast began his employment as a teacher in the Chicago public schools in 1960. On November 21, 1981, Van Kast became principal of John Marshall Metropolitan High School (Marshall). Marshall is located on Chicago's west side, in a neighborhood characterized by high unemployment, a lack of educational achievement, and a high crime rate. While Van Kast was principal, Marshall had an enrollment of approximately 2,000 students, and a staff of 120 teachers, three assistant principals and 30 career service personnel. As principal, Van Kast instituted programs to improve instruction and security at Marshall, as well as to reduce gang activity, vandalism and the student failure (drop-out) rate. Van Kast served as principal of Marshall until he was reassigned to the district office on August 28, 1985.

The 30 specifications allege that as principal, Van Kast violated the "School Internal Accounts Manual" (the Manual) and the "General Bulletins," by failing to keep and maintain accounting books and records for the period June 30, 1982, through August 5, 1985, resulting in numerous accounting discrepancies. The Manual was adopted by the Board in 1975 and contains the policies and procedures to be employed in the management and control of all schools operated by the Board. The Manual directs responsibility to the principal of each school for the conduct of school financial activities, and provides that the school clerk or treasurer is responsible to the principal. "General Bulletins" are issued periodically by the general superintendent's office and contain announcements and reminders of Board policy and procedure.

Specifications 1 through 15 charged Van Kast with the following wrongful conduct: failure to keep books and records at the school; failure to conduct school vending machine sales in accordance with proper procedures, resulting in a school store shortage of $3,361, a

vending machine sales overage of $186.51, and a soft drink sales shortage of $26,196.95; failure to secure prior approval for high school sales grossing over $1,000; failure to generate accounting reports for school activity group sales (*i.e.*, doughnut sales) and commingling the proceeds from such sales; failure to maintain perpetual inventory records for sales of a continuous nature; failure to maintain receipts, invoices or other documentation to demonstrate purchases of goods or services by the school; and failure to account for discrepancies totaling $29,471.04 in the school checking accounts as a result of, *inter alia*, undeposited and unrecorded bank deposits totaling $7,194.77; unrecorded checks totaling $5,799.99; checks totaling $6,452.62 not deposited into school accounts in the order received; 30 checks totaling $2,274.55 made payable to "fictitious" persons; and checks otherwise improperly endorsed.

In addition, the specifications charged that the school's checking account was overdrawn by $18,767.52 during July 1985 and that two school checks payable to the Westin Hotel, Chicago, for a total of $15,304.56 were returned to the bank for insufficient funds; 26 disbursements from student monies totaling $3,087.67 were made for "prohibited" purposes; and the school's outstanding liabilities totalled $46,242.56 on the day of the audit.

In response to the above charges, Van Kast testified that he was never charged with theft or any other criminal offense as a result of the discrepancies revealed in the audit of the school. He further stated that he was never trained in either accounting or the use of the Manual as a prerequisite to becoming a principal. The evidence further disclosed that the "prohibited" expenditures, or those expenditures which do not directly benefit the students, were made for, *inter alia*, the following purposes: payment of dues to the Chicago Principal's Association; the purchase of floral pieces and other remembrances for Board employees or members of their families; hiring a dance instructor; and a donation for Ethiopian relief.

Testimony disclosed the Manual to be quite complex. Emmanuel Purvis, field supervisor for the Board's internal audit department, testified that he had four weeks of training in the provisions of the Manual. Yet, Purvis stated, even after daily use of the Manual for several years in 210 school audits, he did not know the provisions of the Manual "backwards and forwards."

In addition, Michael Smith, a certified public accountant, testified as an expert witness on Van Kast's behalf. Smith testified that Van Kast would have had to perform a comprehensive audit, similar to the audit conducted by Purvis, in order to insure compliance

with the Manual. Smith stated that it could take a principal of a high school the size of Marshall between two and three hours per day just to deal with the daily cash deposits.

Smith further testified that the "missing" funds associated with the Marshall audit can all be classified as being within the student activity fund, and that the fund is a small and insignificant percentage of the entire school budget. Smith stated that a deficit in the student activity fund would not prevent the school from operating and would not indicate that a school was bankrupt.

Specification 16 alleged that Van Kast violated the Manual by failing to comply with procedures pertaining to employee payroll and attendance. Specifically, neither Van Kast, nor his designee, signed 274 out of 427 time sheets examined by the auditor; in 19 instances 13 employees were reported and paid as usual for days on which they did not sign out; and "Cause of Absence" forms were not maintained on file to support benefit days taken by five employees.

In specification 17, the Board alleged that following an audit conducted at Marshall for the period September 11, 1982, to February 28, 1983, Van Kast was informed of certain irregularities, discrepancies and failures to follow established procedures, and restitution was requested from Van Kast in connection with certain concession sales.

The evidence disclosed the following background information surrounding the 1983 audit. In November 1982, Van Kast sent a written notice to the internal audit department requesting that an audit be performed at the school. The audit department responded, requesting that Van Kast ensure that the books and records were maintained properly in the interim. On November 17, 1982, an auditor arrived at Marshall to perform the audit, but could not do so because the books were not current and the records had not been posted since May 31, 1982. Van Kast was asked to notify the audit department when the books were made current so that the audit could be performed. The hearing officer noted that the record is silent as to whether the audit department ever received such notification from Van Kast.

On or about February 15, 1983, the audit department received a letter from a vendor complaining that it had not yet been paid for merchandise it had sent to Marshall in October 1981. Board auditor Adalbert Kouba testified that the special audit at Marshall in March 1983 was initiated because of the vendor's complaint.

The 1983 special audit report revealed certain accounting discrepancies which were still not corrected as of the 1985 audit. For example $153.99 was still unaccounted for from vending machine sales, $500 was unaccounted for from key chain sales, and corrected attendance reports had not been prepared.

Van Kast presented evidence of the results of audits performed on other high schools which indicated that technical violations of the Manual were not uncommon in the Chicago public schools. The evidence disclosed: In 49% of the high schools, the general ledger was not posted in accordance with the Manual; 67% of high schools' concession sales were not conducted in accordance with the Manual; 33% of high schools' perpetual inventory records were not maintained; 39% of the high schools had some discrepancy involving bank receipting procedures; 50% of high schools had some discrepancy with teacher receipt books; in 79% of high schools, proper approval for expenditures as required by the Manual was not obtained; 58% of high schools had payroll discrepancies; 67% of high schools were cited for a lack of security for cash on school premises; and 39% of high school principals failed to inspect bank statements.

The evidence further revealed that other Chicago public school principals failed to comply with the provisions of the Manual and were not terminated for such noncompliance. District Superintendent Dr. Grady Jordan testified that he has worked for the Board since 1961, serving as a teacher, elementary school principal, and a high school principal prior to becoming district superintendent. Despite his experience, Jordan stated that he was not familiar with the provisions of the Manual and would familiarize himself with the rules only "as problems came up."

The Board's exhibits revealed that under Van Kast's predecessor principal, Dr. Saddler, Marshall's general ledger was not posted for several years. Sandra Taylor, clerk/treasurer under Saddler, testified that during his tenure, Saddler was aware that the books were not current. Nevertheless, Saddler was promoted by the Board from principal of Marshall to district superintendent.

The evidence disclosed that John Gibson was selected to replace Van Kast as principal of Marshall. Prior to his selection, Gibson was principal of the Cook County jail school. An examination of the audit of that school, submitted as an exhibit by Van Kast, revealed that Gibson demonstrated noncompliance with the Manual resulting in similar discrepancies to those charged against Van Kast. In addition, evidence of the audits of Thomas Kelly High School and Whit-

ney Young High School revealed similar discrepancies, and neither of the principals of these schools was terminated as a result of the audit findings.

Specifications 18 through 30 alleged that Van Kast grossly neglected his duties as the administrative head of Marshall. Among other things, the Board charged Van Kast with failure to monitor and supervise the work performance and activities of the school's clerk-treasurer, Mercedene Evans, "despite the fact the [sic] Mr. Van Kast was on notice of her errors."

The evidence revealed that Van Kast assigned Evans to take over the treasurer's duties in the fall of 1982. Purvis testified that the treasurer is responsible for the financial activities at a school, detailing the treasurer's duties as follows: issue receipts for all moneys received; deposit monies into the bank; prepare checks; provide supporting documentation; reconcile bank statements; and keep physical possession of and maintain the books of record, including the cash journal, receipts and disbursements, the general ledger and an equipment register. Purvis testified that if a school is found to be nonauditable because the books have not been posted for three months, it is the treasurer who is asked to bring them up to date.

When Purvis arrived to conduct an audit of the Marshall school accounts on August 2, 1985, Van Kast informed him that the books were not at the school, that Evans had the books at her home and that Van Kast had some problems trying to get the books back into the school. Purvis returned to perform the audit on August 5, 1985. At that time, the books were still not on the school premises, but after Purvis spoke with Evans, she retrieved the books from her home and returned them to the school.

Additional testimony revealed that school personnel complained to defendant about Evans' performance on several occasions for, among other things, typographical and arithmetic errors in reports; discrepancies in receipts; and handling and securing student monies she collected in connection with the showing of movies at the school.

Van Kast testified that he did not specifically remember when he received the first complaint regarding Evans, but that he believed he received complaints about Evans in the period from 1983 through 1986. To that end, Van Kast stated that he attempted to replace Evans, but was informed by the Board that there was no tenured employee available to take the position. Van Kast admitted that in a three-year period of time, he spent approximately six minutes supervising Evans' performance, but stated that he would ask

Evans questions to give her the impression that he was checking up on her without actually doing so.

Fowler found that, contrary to the charge, Van Kast was not on notice as to the deficiencies of Evans' work performance. Testimony indicated that Evans had been employed as a clerk by the Chicago public schools since 1982 and had consistently received high evaluations from all of her superiors.[1]

The specifications further charged Van Kast with failure to provide and secure an area for storage of school supplies and school cash for the school store. The testimony disclosed that at various times, supplies were kept in unlocked closets in the unlocked teachers' lounge. Fowler found that while undisputed, this evidence failed to substantiate any violation of the Manual.

In addition, Van Kast was charged with improperly authorizing funds to be used for expenditures other than those for which the funds had been designated. For example, monies collected from students for the 1985 graduating class luncheon and student prom were not available for payment for these purposes, and checks written for these purposes were returned for insufficient funds. Testimony further disclosed that Van Kast failed to review and inspect on a regular basis the school's bank statements, the general ledger and the school's cash journals. Van Kast stated that on three occasions between 1982 and 1985 he requested reconciled bank statements from Evans, but that he never received them.

Van Kast was also charged with frequent and excessive absence from the school building. Witnesses testified that Van Kast was frequently absent during the 1984-1985 school year, generally in the afternoon after 1 p.m. or 2 p.m., and that this was a marked difference from his presence in previous years. For example, Joyce Washington, the office manager at Marshall, testified that on several occasions, Van Kast could not be reached by telephone at forwarding numbers he had left with her. Ernest White, an assistant principal, testified that he once saw Van Kast leaving the school at 1:15 p.m., and overheard him tell the office, "I will be at the Urban League." Dr. Jordan testified that when he and Van Kast participated in programs at the Urban League, the meetings were held after school hours, usually at 5 p.m.

---

[1]The record does not disclose what disposition, if any, was made regarding any charges alleged against Evans.

The specifications concluded with charges that Van Kast's lack of diligence as a principal resulted in a school bank balance of $18.71 as of July 31, 1985. The record indicates that Marshall opened for the fall term as usual in 1985.

In his written opinion, Fowler addressed each of the above specifications, finding in each case that the charges were supported by the evidence, but that the Board asserted that the charges were much more serious than they appeared to be on their face. Fowler found that the evidence failed to support the Board's assertions that: the school went broke; the school was banned from all major hotels in the downtown area; that the community was in a state of shock; that the faculty was completely alienated from Van Kast; that the students would have a lasting scar; and that the faculty, staff and students were irreparably damaged, demoralized and embarrassed.

Fowler found Marshall's reputation in the community unharmed by the shortage of school funds, noting the testimony of students and staff. Regarding the damage to the students, the Board presented one student witness, Angeline Washington-Young. Fowler found that Young's testimony presented a positive image of Van Kast. Young stated that Van Kast was an excellent principal; that he was deeply concerned with the progress and welfare of the students; and that he physically patrolled the halls of Marshall at a seemingly impossible rate of speed.

Fowler further found that despite the Board's claim that the school was banned from all "major downtown hotels" following the bouncing of the two Westin Hotel checks in 1985, the 1986 student prom was held as scheduled at the McCormick Inn, and in 1987, the senior luncheon and prom were held at the Palmer House Hotel, both "major downtown hotels." Fowler found the Board's claim further discredited by Tom Januska, the credit manager for the Westin Hotel, who testified that Marshall is still a welcome customer at the Westin, despite the bounced checks.

Regarding faculty morale, Fowler cited the testimony of Emma McGee, a teacher's aide, who stated that no teacher quit, resigned or stopped working upon disclosure of Marshall's financial problems, and that parents did not complain about Marshall's financial situation. Moreover, the testimony of Chicago Police Sergeant Claudell Ervin, the neighborhood community relations officer, indicated that there was no decline in community morale because of Marshall's financial problems. Ervin stated that the general feeling in the community was that Van Kast had done nothing wrong.

Fowler found that in each case specified, the Board failed to provide defendant with a written warning that failure to remedy his conduct would result in charges, as required by section 34—85 of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 34—85). Fowler concluded that the Board failed to prove by a preponderance of the evidence that Van Kast's conduct was irremediable and that the Board was therefore without jurisdiction to dismiss defendant.

The Board appealed Fowler's decision to the circuit court. The parties presented arguments, after which the court issued a written opinion finding: "The conclusion that these proofs do not demonstrate irremediable conduct is wrong as a matter of fact and as a matter of law." The trial court specified that its decision was based on its own findings of fact and conclusions of law:

> "I have prepared findings of facts and conclusions of law. These comments that I will be making will stand as my findings of fact and conclusions of law. No order will be entered unless it recites that such findings and conclusions have been offered and are incorporated by reference in the order."

Defendants' timely appeal of the trial court's order followed.

OPINION

Our review authority is set forth in section 34—85(b) of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 34—85(b)), which provides that judicial review of the Commission's decision be in accordance with the Administrative Review Law (Ill. Rev. Stat. 1985, ch. 110, par. 3—101 *et seq.*). The Administrative Review Law provides that our review extends to all questions of law and fact presented by the entire record. (*Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 88, 606 N.E.2d 1111.) The statute additionally mandates that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." Ill. Rev. Stat. 1985, ch. 110, par. 3—110.

These statutory provisions have been construed to mean that, on administrative review, it is not a court's function to reweigh the evidence or make an independent determination of the facts. (*Abrahamson*, 153 Ill. 2d at 88.) The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. The reviewing court may not substitute its judgment for that of the administrative agency. *Abrahamson*, 153 Ill. 2d at 88.

The record shows that the trial court made findings of fact on administrative review, contrary to the principles set forth in *Abrahamson*. We therefore find that the trial court's fact finding constituted error and proceed to consider the fact findings of the hearing officer. We note that the parties have agreed that the facts are undisputed.

The controlling issue for our consideration is whether the hearing officer's finding of remediability was contrary to the manifest weight of the evidence or was erroneous as a matter of law. (*Board of Education v. Harris* (1991), 218 Ill. App. 3d 1017, 1023, 578 N.E.2d 1244.) A finding is against the manifest weight of the evidence if conclusions opposite to those reached by the agency are clearly evidenced. *Board of Education v. State Board of Education* (1987), 160 Ill. App. 3d 769, 772, 513 N.E.2d 845, 851.

Under section 34—85 of the School Code, no tenured employee shall be removed except for cause, and written warnings must be given before dismissal, unless the conduct which forms the basis of charges seeking dismissal is deemed irremediable. (Ill. Rev. Stat. 1985, ch. 122, par. 34—85.) A cause is irremediable when irreparable damage has already been done and cannot be remedied. *Jepsen v. Board of Education of Community High School District No. 307* (1958), 19 Ill. App. 2d 204, 207, 153 N.E. 417.

The test for determining whether conduct is irremediable, set forth by the Illinois Supreme Court in *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622* (1977), 67 Ill. 2d 143, 153, 365 N.E.2d 322, is: (1) whether damage has been done to the students, faculty or school, and (2) whether the conduct could not have been corrected had superiors warned the individual charged. (*Gilliland*, 67 Ill. 2d at 153, 365 N.E.2d at 326.) Even when individual causes, considered in isolation, may be remediable, courts have found that a combination of a number of charges, and a showing of a continuous nature to the conduct, may provide a sufficient basis for a finding of irremediability. (*Gilliland*, 67 Ill. 2d at 154; *McCutcheon v. Board of Education* (1981), 94 Ill. App. 3d 993, 998, 419 N.E.2d 451.) If charges are remediable but the tenured employee is not given proper notice in writing, however, the failure to provide the warnings required by the School Code deprives the Board of jurisdiction. *Szabo v. Board of Education of Community Consolidated School District 54* (1983), 117 Ill. App. 3d 869, 873, 454 N.E.2d 39, citing *Aulwurm v. Board of Education* (1977), 67 Ill. 2d 434, 442-43, 367 N.E.2d 1337.

The first part of the *Gilliland* test for irremediability requires that the tenured employee's conduct have caused damage to students, faculty or school. Here, the hearing officer found no detrimental consequences suffered by the students, school or faculty as the result of Van Kast's conduct, and that the Board's charges that "the school went broke; the school was banned from all major hotels in the downtown area; the community was in a state of shock; the faculty was completely alienated from Van Kast; the students would have a lasting scar; and that the faculty, staff and students were irreparably damaged, demoralized and embarrassed" were unfounded. The hearing officer cited the record, which in fact discloses that the students, faculty and community held Van Kast in high regard, describing him as an excellent principal and an example to the community. The record further discloses that a deficit in the student activity fund did not prevent Marshall from opening in the fall of 1985. No evidence was presented that faculty and staff did not receive paychecks, or that any academic, athletic or extracurricular program was terminated or reduced because of Marshall's financial position. We agree that the Board failed in its burden to prove damage to the school, faculty and students.

The second part of the *Gilliland* test requires that the charged conduct have been incapable of correction even if the tenured employee had been warned. The Board contends that any warning to Van Kast would have no effect. Although the Board concedes that each charge considered independently does not constitute irremediable conduct, the Board argues that the present case is similar to *Gilliland* and *McCutcheon*, where remediable conduct continued for such an extensive period of time that it became irremediable. In *Gilliland*, a complaint was filed against a teacher charging her with, *inter alia*, giving excessive homework assignments to students, cruelty and excessively punishing students, and shouting at students. This conduct, once remediable, was found irremediable because it continued over four years, during which time there were numerous and ongoing parental complaints resulting in discussions between the teacher and her superiors regarding her conduct. (*Gilliland*, 67 Ill. 2d at 148-49.) Similarly, in *McCutcheon*, irremediability was established where evidence supported charges against a principal for the principal's pattern of disrespect for school policy and insubordination to school personnel in the face of repeated attempts to persuade the principal to follow established procedures and policy. *McCutcheon*, 94 Ill. App. 3d at 998.

We find *Gilliland* and *McCutcheon* distinguishable. In the present case, the record reveals that Van Kast was never admonished by the Board to correct his conduct regarding his oversight of accounting and bookkeeping procedures at Marshall. There is no evidence in the record of ongoing complaints by parents or school personnel about Van Kast's failure to follow proper accounting procedures. Cases which deal with the principle of once remediable conduct becoming irremediable conduct require some continuing warning that the conduct in question was inappropriate (*Hegener v. Chicago Board of Education* (1991), 208 Ill. App. 3d 701, 739, 567 N.E.2d 566, 591), and such cannot be found in the record of the present case. We therefore find that the Board has failed to demonstrate that Van Kast's noncompliance with the provisions of the Manual and the "General Bulletins" could not have been rectified upon proper notice. The Board's further reliance on cases outside this jurisdiction is unavailing.

The Board further argues that because Van Kast testified "with a cocky, defiant air as to his lack of interest in or concern about the financial affair of Marshall," any warning would have been futile. However, this court has determined that the statute requiring such a warning (Ill. Rev. Stat. 1987, ch. 122, par. 34-85) makes no exception for instances where the school board deems such warning "futile." (*Hegener*, 208 Ill. App. 3d at 739-40, 567 N.E.2d at 591.) In *Hegener*, the defendants argued that the fact that a teacher had for many years engaged in personal relationships with students made any attempt to warn her to stop such conduct futile. This court found that even if futility would obviate the need to warn, there was no basis to assume that a written warning would have no impact: "[i]t is precisely because such conduct was longstanding and widely practiced at the school by other teachers as well that the conclusion of futility is unwarranted." *Hegener*, 208 Ill. App. 3d at 740.

Similarly, in the present case, inept bookkeeping and accounting was a longstanding practice at Marshall. The record indicates that this is the first time strict compliance with the Manual has been enforced against a Chicago public high school principal. The facts reveal that Marshall's books were not kept current by Van Kast's predecessor and that similar discrepancies recorded against the principals of Thomas Kelly High School and Whitney Young High School did not result in these principals' termination. From the record, we find that this was the Board's first attempt to check such conduct. Thus, the conclusion of futility here is unwarranted.

■ We conclude that nothing in the record suggests that Van Kast would not have taken measures to correct his bookkeeping deficiencies had he been warned. As this court stated in *Hegener*, "A warning would appear to be particularly appropriate in this case, where the Board is apparently taking a new position on relatively widespread conduct of which it previously had tacitly approved or to which it had apparently turned a blind eye." (*Hegener*, 208 Ill. App. 3d at 740.) As stated above, we also find that the Board has failed to prove damage to the students, faculty and school. The evidence in the present case therefore does not sustain a charge of irremediability, and the Board is deprived of jurisdiction of this matter. (See *Szabo*, 117 Ill. App. 3d at 873.) We therefore find the judgment of the hearing officer proper, and reverse the judgment of the trial court.

For the reasons stated above, the judgment of the circuit court is reversed.

Reversed.

MANNING, P.J., and O'CONNOR, J., concur.