RONALD IVY, Plaintiff-Appellant, v. ILLINOIS STATE POLICE *et al.*, Defendants-Appellees.

First District (1st Division)    No. 1—92—0253

Opinion filed March 8, 1994.—Rehearing denied June 22, 1994.—Modified opinion filed June 27, 1994.

John M. Hosteny, of Springfield, for appellant.

Schiff, Hardin & Waite, of Chicago (Joseph J. Duffy and Linda K. Stevens, of counsel), for appellee Illinois State Police.

Edward J. King, Special Assistant Attorney General, of Chicago, for appellee Illinois State Police Merit Board.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following an administrative hearing, plaintiff, Ronald Ivy, was discharged from his position as an Illinois State trooper by the Illinois State Police Merit Board (Merit Board) for violations of Department policy. Ivy sought administrative review in the circuit court of Cook County, naming the Merit Board and the Illinois State Police (Department) as defendants. The circuit court affirmed the hearing officer's decision. On appeal, Ivy contends that: (1) the hearing officer improperly prevented him from calling witnesses on his behalf at the administrative hearing; (2) the charges against him must be dismissed because they are based on the same conduct and allegations from which he was previously cleared; (3) the hearing officer's findings of fact and conclusions of law are contrary to the manifest weight of the evidence; (4) the hearing officer failed to make and report findings of fact on material issues in his favor; and (5) the Merit Board erred in determining that the hearing officer's findings of fact provided a sufficient basis for his discharge. For the following reasons, we reverse the judgment of the circuit court and remand this matter for further proceedings consistent with this opinion.

The record sets forth the following relevant facts. On May 10, 1987, Ivy was on duty patrolling Interstate 94 at Route 394 in a marked police squad car. At approximately 3 p.m., Ivy stopped Messenger, who was driving a Toyota Forerunner truck, for failure to wear a seat belt and for an expired license registration.

Messenger, age 19, told Ivy that the truck belonged to his father and that he was not aware of any problem with the registration. Ivy informed Messenger that because he was driving the truck, he would receive the citations. Because Messenger was driving on a previous traffic citation and had neither his license, a bond card, nor $50 to post bond, Ivy informed Messenger that he would have to be processed at the police station. Ivy initially agreed to take Messenger to Messenger's father to get the bond money, but then changed his mind and proceeded to the Sauk Village police station. Ivy allowed Messenger to ride in the front seat of the squad car and did not place Messenger in handcuffs.

At approximately 3:30 p.m., Ivy led Messenger into the booking

room at the Sauk Village police station to be processed and incarcerated pending the posting of bond. During the booking process, an altercation ensued between Ivy and Messenger, wherein Ivy punched Messenger in the eye. The record indicates that the injury required five stitches.

Following the incident, Messenger filed a personnel complaint against Ivy with the State Police. On October 1, 1987, following an investigation into the complaint, Colonel L.A. Nargelenas, Superintendent of the State Police, Division of State Troopers, issued a short memorandum in which he stated that Ivy acted properly under the circumstances and that he did not wish to seek disciplinary action. Nargelenas concluded by ordering that the case be closed.

In January 1988, Messenger filed a three-count complaint in the United States District Court against the Department, Ivy and Master Sergeant Salinas, Ivy's immediate commander, for "abuse, coercion, brutality, and unusual punishment"; civil rights violations under section 1983; and assault and battery. Messenger sought the same damages for each count: compensatory damages from each defendant, jointly and separately, in the amount of $1,100; punitive damages against each party in the amount of $100,000; and costs. The record indicates that all three defendants were represented by the Office of the Illinois Attorney General, and that sometime on or before October 26, 1988, an assistant Attorney General settled the civil action. Documents relating to the settlement and the terms of the settlement are not included in the record on appeal.[1]

On June 9, 1989, the Director of State Police filed a two count complaint with the Merit Board charging Ivy with violating Department policy based on the May 10, 1987, incident. At Ivy's request, a hearing on the sufficiency of the Merit Board's charges proceeded before hearing officer Terry C. Chiganos, on January 8, 1990, concluding on January 10, 1990.

Ivy was charged by the Merit Board with two counts of alleged violations of the rules of conduct of the Department of State Police. In count I, the Merit Board alleged violations of the Illinois State Police Rules of Conduct (Rules of Conduct), paragraph 1—6, *Unbecoming Conduct*, paragraph 1—36, *Treatment of Persons in Custody*, and

---

[1]After the opinion in this case was filed, the Illinois Attorney General filed a petition to intervene in this cause. The petition raised new facts and alleged matters going far beyond the facts set forth in the record on appeal submitted to this court. We denied the petition, and the Illinois Supreme Court denied the Attorney General's subsequent motion seeking a supervisory order reversing our decision. (No. 77034.) We are bound by and adhere to the facts as set forth in the record on appeal of this matter.

paragraph 1—37, *Use of Force.* In count II, the Merit Board alleged violations of the Rules of Conduct, paragraph 1—31, *Abuse of Process,* and paragraph 1—39, *Arrest, Search, and Seizure.*

The record shows that the booking room was monitored by a video camera and that all activity taking place in the room was recorded on video tape. A copy of the video tape and a transcript of the audio portion of the tape were introduced into evidence at the hearing. The hearing officer considered the video tape to be the best evidence of the events that transpired in the Sauk Village booking room, and the basis of the charges and alleged violations of the Rules of Conduct against Ivy.

Following the hearing, the hearing officer submitted a written report containing the following findings of fact and conclusions of law. Ivy testified to the events surrounding the traffic stop, as stated previously. Ivy further stated that although Messenger was not disrespectful to him in the squad car, he was very "verbal." Messenger testified that Ivy was not courteous and used harsh language and profanity toward him from the outset of the incident.

Once in the booking room, Ivy told Messenger to sit on the "prisoners" bench, and Messenger complied. Sauk Village police officer Kevin Koliboski testified that the bench was wobbly and wooden, approximately one foot wide and two feet high. Ivy sat at the desk in the center of the room and called his headquarters. During the telephone call, Ivy referred to Messenger as a "snot smart kid." Ivy admitted during the hearing that this comment constituted conduct unbecoming an officer.

Messenger informed Ivy that he had a telephone number where his father could be reached, and then gave Ivy a telephone number. Ivy dialed the number and hung up after 14 seconds. Ivy asked Messenger for another telephone number, claiming that he had let the telephone ring nine times without getting any answer. Messenger and Ivy argued about whether Ivy let the telephone ring long enough. Ivy then told Messenger to "sit over there and shut up." Messenger persisted that Ivy did not let the telephone ring long enough and that he was allowed one telephone call.

Ivy then told Messenger to empty his pockets, take his belt off and sit down on the bench. Ivy then left the room, and reentered with Officer Koliboski. Koliboski told Messenger to take the shoelaces out of his shoes, while Messenger continued to request a telephone call. Ivy told Messenger, "I've just about had enough of you, ok?"

The hearing officer found that Ivy lost his patience and became agitated with Messenger. Ivy testified that Messenger was complying with his direction to remove his shoelaces, but stopped several times

and had only partially removed one lace after a period of time. Ivy then told Messenger that he would remove Messenger's shoelaces from his shoes if Messenger would not remove them himself, and to "shut up" and take his shoes off.

Ivy then approached Messenger, who was seated on the bench with his legs crossed, grabbed Messenger's left foot and pulled his shoe off. Ivy then grabbed Messenger's right foot and pulled off the shoe. At that point, Messenger's leg swung over to the side of the bench.

Messenger testified that when Ivy pulled his right foot and took the shoe off, the force of the motion pulled him sideways and he lost his balance and started slipping off the bench. Messenger stated that he stood up to keep from falling to the floor. Ivy testified that Messenger stood up on his own after the shoes were removed. Officer Koliboski stated that Messenger jumped off the bench when Ivy pulled his shoe off, but was spun to the side and may have lost his balance.

When Messenger stood up he was facing Ivy, who stood in front of Messenger with his hands out and at his side. Ivy testified that he was startled when Messenger sprang up and that he felt "physically challenged" by Messenger. Ivy stated that he immediately threw his hands on Messenger's shoulders, grabbing him in the shoulder and collar area, and started to press Messenger down toward the bench. Ivy stated that he at no time choked Messenger's neck.

Messenger testified that when he stood up, Ivy started choking him and Messenger put his hands on Ivy's wrists to get Ivy's hands off his neck because Ivy was hurting him.

Ivy stated that when Messenger brought his hands up to grab Ivy's wrists, Messenger struck Ivy in the chest area, and then Messenger's hand came up under Ivy's chin and struck him under his chin, causing Ivy to bite his tongue. Ivy stated that he did not report any injuries at the time they occurred because he did not feel injured until sometime later.

Officer Koliboski testified that Ivy put his hands approximately on Messenger's collar bone area and told Messenger, "don't stand up." Officer Koliboski stated that he did not see Messenger strike Ivy in the face or chest. He further stated that he did not observe any type of aggression or hostility by Messenger toward Ivy.

As Ivy and Messenger stood facing each other, Ivy pulled his right arm away from Messenger, drew his arm back, and punched Messenger in the face. Messenger then fell to the floor, grabbed his eye, and began to scream. Ivy then pulled Messenger up from the floor to the bench and handcuffed him to the wall. Officer Koliboski

left the room, returned moments later, and assisted Messenger with his injury. Officer Koliboski then called paramedics and Messenger was transported to the hospital where he received five stitches for a cut to his eye area.

Following Messenger's treatment, Ivy transported Messenger back to the Sauk Village police station, where Messenger's parents posted bond for Messenger's release.

Upon his return to the police station, Ivy was informed that the incident in the booking room was recorded on video tape, and he then watched a portion of the tape. Subsequently, Ivy filed a report charging Messenger with battery and resisting arrest.

Hearing officer Chiganos found that the Merit Board had met its burden of proof with regard to counts I and II of its complaint against Ivy. Chiganos found that Ivy did not act in a professional manner and in accordance with the rules and regulations in effectuating his arrest of Messenger. Chiganos found that Ivy's punch to Messenger's eye was "without question more force than was reasonably necessary under the circumstances." Chiganos also found that Ivy's references to Messenger as a "smart mouthed kid," and "snot nosed kid," and his confrontational attitude, coupled with his unjustified striking of Messenger, were conduct unbecoming an officer.

Chiganos further found that the evidence presented at the hearing was sufficient to find that Ivy mistreated Messenger while in custody, that he abused the State Police process, and that Ivy knew that Messenger's arrest was not in accordance with the law and the State Police departmental procedures. Chiganos concluded that Ivy was in violation of all Rules of Conduct as alleged by the Merit Board.

Following the issuance of Chiganos' report, the Merit Board adopted the findings of fact and conclusions of law contained in the report, and ordered that Ivy be removed and discharged from employment with the Department.

Ivy appealed Chiganos' decision to the circuit court. On December 12, 1992, the trial court issued an order affirming the findings and conclusions of the hearing officer and affirming the decision of the Merit Board. Ivy's timely appeal of the trial court's order followed.

Initially, Ivy contends that the hearing officer improperly prevented him from calling witnesses on his behalf at the administrative hearing.

The record indicates that the hearing officer granted the Department's motion *in limine* to prevent Ivy from introducing evidence of the initiation and settlement of the civil lawsuit filed against him through the testimony of the assistant Attorney General. The record discloses that Ivy intended to call the assistant Attorney Gen-

eral as a witness to: (1) confirm that Ivy was not advised of the terms of the settlement or of the amount of the settlement until after the settlement was concluded; (2) explain how the amount of the settlement was determined and the rationale behind the settlement; and (3) explain how the disciplinary investigation was reopened during or after his representation of Ivy in the civil action.

The record shows that the hearing officer denied introduction of this proposed testimony based on the definition of "relevant evidence" set forth in the Federal Rules of Evidence. Rule 401 defines relevant evidence as:

> "[evidence] having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Ivy now contends that the more applicable Federal Rule of Evidence is Rule 408, which provides in pertinent part:

> "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. *** This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness ***." (Fed. R. Evid. 408.)

Ivy argues that he was not offering evidence of the initiation and settlement of the civil lawsuit to prove guilt or innocence of the underlying claim, but rather, to show bias and motive on the part of the Department.

Defendants respond that Federal Rule of Evidence 408 is not relevant here because the rule allows evidence "proving bias or prejudice of a *witness*" (emphasis added) for the purpose of impeaching that witness' testimony, and that the Department is a party to the instant lawsuit, not a witness. Defendants further contend that under Rule 408, the assistant Attorney General would not be allowed to testify regarding the civil lawsuit settlement because he is not an officer or employee of the Department and had no part in the decision to file the complaint against Ivy.

■ Our review extends to all questions of law and fact presented by the entire record. On review, the findings and conclusions of the administrative agency on questions of fact shall be deemed *prima facie* true and correct (*Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 88, 606 N.E.2d 1111; *Board of Education v. Van Kast* (1993), 253 Ill. App. 3d 295, 304) and

shall not be disturbed on review unless they are contrary to the manifest weight of the evidence. *Callahan v. Department of State Police* (1991), 223 Ill. App. 3d 1081, 1085, 586 N.E.2d 381.

■ However, as a reviewing court, we are not bound to give the same deference to an agency's conclusions of law and will reverse a decision based on an erroneous interpretation or application of the law. *Nichols v. Department of Employment Security* (1991), 218 Ill. App. 3d 803, 809-10, 578 N.E.2d 1121.

Our supreme court has held that the strict rules of evidence that apply in a judicial proceeding do not apply in proceedings before an administrative agency. (*Kaske v. City of Rockford* (1983), 96 Ill. 2d 298, 450 N.E.2d 314; *Durkin v. A.H. Luecht & Co.* (1942), 379 Ill. 227, 40 N.E.2d 69.) We therefore reject defendants' contention that the Federal Rules of Evidence control the administrative hearing at issue in the present case.

Regarding Ivy's proffered testimony, we find it necessary to review the facts surrounding Ivy's representation in the civil action. The record indicates that Ivy, Master Sergeant Salinas and the Department were all represented by the same assistant Attorney General. Defendants informed this court that the Department provided counsel to Ivy, Salinas and the Department, as required by statute. Defendants represented that because the interests of Ivy, Salinas and the Department were identical regarding the allegations, representation by a single defense attorney was proper.

■ We disagree. Pursuant to the Illinois Rules of Professional Conduct, an attorney may not represent a client if the representation will be directly adverse to another client, unless the attorney reasonably believes the representation will not adversely affect the relationship with the other client or the client consents after disclosure. (134 Ill. 2d R. 1.7(a).) Further, a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests. 134 Ill. 2d R. 1.7(b).

We note that this court has found a conflict of interest between multiple defendants under similar circumstances to the facts presented here. In *Illinois Municipal League Risk Management Association v. Seibert* (1992), 223 Ill. App. 3d 864, 871, 585 N.E.2d 1130, 1135, a police officer was sued, along with other officers and the City of Mattoon, for violation of an arrestee's civil rights under section 1983 of the Civil Rights Act. (42 U.S.C. § 1983 (1988).) The arrestee alleged both constitutional violations and punitive damages claims against all parties.

Officer Seibert brought a declaratory action alleging that a

conflict of interest with the association defending the self-insured City of Mattoon required that the association pay for outside counsel to represent him. Seibert noted that although the association was required to represent and indemnify police officers against civil rights claims, indemnification was not provided for punitive damages.

The trial court granted the association's motion for summary judgment and denied Seibert's similar motion, finding that because evidence needed to disprove a constitutional violation and a punitive damages claim is similar in nature and quantity, the association could defend both claims without a conflict of interest.

On appeal, Seibert argued that his circumstances were similar to those that arise when an attorney is hired by an insurance company to represent both the insured and the insurance company. Under such circumstances, the attorney may find it more financially advantageous to protect the insurer's interests, and the attorney is obligated to recognize and address potential conflicts between the insurer and the insured. The association countered that there was no conflict of interest because it is a nonprofit organization and not a "huge commercial insurance carrier." However, this court found that the same loyalty problems could arise despite the voluntary, non-profit nature of the association:

> "Just as an attorney might face insurmountable conflicts of interest between his or her employer, a commercial insurance company, and an insured, the same problems could arise between an attorney employed by the Association and municipal employees represented and indemnified by the Association." (*Seibert*, 223 Ill. App. 3d at 871.)

This court reversed the judgment of the trial court, holding that the association was required to pay for Officer Seibert's independent counsel.

■ While we are not faced with identical issues here, *Seibert* is instructive by analogy. In the present case, Messenger filed a civil rights claim against the three defendants, in addition to alleging punitive damages of $100,000 against each party. Under the circumstances, a strong potential for a conflict of interest exists between Ivy, Master Sergeant Salinas, and the Department, because Salinas and the Department are in the position to make unilateral decisions regarding Ivy's employment. Ivy's lack of control over the defense of the civil lawsuit precluded him from attempting to show the possibility of antagonistic defenses among the three defendants.

Ivy argues that he was denied the opportunity to present evidence at the hearing that he was not consulted regarding the settlement of the civil claim. Again, an analogy to the situation where

an attorney represents both the insured and the insurer is appropriate here:

> "Any attorney-client relationship includes the duty for the attorney to advise the client of progress in a case or controversy, and this duty is not altered by the presence of a third-party insurer whom the attorney also represents. An insured must be informed of any settlement offers that affect him so that the insured may take proper steps to protect his own interests." (*Rogers v. Robson, Masters, Ryan, Brumund & Belom* (1979), 74 Ill. App. 3d 467, 474, 392 N.E.2d 1365.)

The Assistant Attorney General therefore had the duty to inform Ivy of the terms of the settlement.

We are further concerned by the facts surrounding the subsequent administrative complaint filed against Ivy. It is unclear from the record how the complaint in the Merit Board came to be filed against Ivy more than two years following the incident of May 10, 1987. From the facts available, it can be argued that the settlement of the civil action may have served as a catalyst, promoting the filing of the discharge proceedings against Ivy.

Under the circumstances, we find that the decision of the hearing officer, denying the introduction of evidence relating to the settlement of the civil lawsuit, was error as a matter of law. (*Van Milligan v. Board of Fire & Police Commissioners* (1994), 158 Ill. 2d 85, 96.) We therefore reverse the judgment of the trial court and remand this case for a hearing *de novo*. However, on remand, our decision is not to be considered a prejudgment of the allegations, and we make no determination or speculation with respect to the outcome of a new hearing.

Because we reverse and remand this matter on the grounds stated above, we find it unnecessary to address the other issues raised by Ivy at this time.

For the above reasons, the judgment of the trial court is reversed and this matter remanded for a hearing *de novo*.

Reversed and remanded, as modified.

O'CONNOR and MANNING, JJ., concur.